Elijah Behringer
behringerlaw@pm.me
PO Box 2973
Crestline, CA 92325
(909) 222-5370



**FILED**
CLERK, U.S. DISTRICT COURT

05/23/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP' _____ DEPUTY

FEE PAID

N/S

# IN THE UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Elijah Behringer**, | Case No.  5:23-cv-00934-JFW(SK) |
| Plaintiff, | |
| v. | **COMPLAINT – Civil Rights Action Under Title 42 U.S.C. § 1983** |
| **California Polytechnic State University, San Luis Obispo** (Cal Poly); | |
| Cal Poly President **Jeffrey Armstrong**, in his official and individual capacity; | **DEMAND FOR JURY TRIAL** |
| Cal Poly Administrator **Tina Hadaway-Mellis**, in her official and individual capacity; | |
| Cal Poly Administrator **Valla Hardy**, in her official and individual capacity; | |
| Cal Poly Administrator **Amy Gode**, in her official and individual capacity; | |
| The municipal government of **San Luis Obispo County**; | |
| County Health Officer **Penny Borenstein**, in her official and individual capacity; | |
| Defendants. | |

# TABLE OF CONTENTS

JURISDICTION AND VENUE ...................................................................4

PARTIES .................................................................................................4

INTRODUCTION .....................................................................................6

FACTS PRESENTED ...............................................................................6

PRELIMINARY ISSUES OF LAW PRESENTED........................................9

    First Preliminary Issue of Law – Was there a state of emergency authorizing county officials and university administration to enact orders for students to follow? .........................................................................9

    Second Preliminary Issue of Law – Were those who proclaimed or enforced the university and county orders protected from legal liability? ..................12

LIST OF COUNTS.................................................................................. 15

    Federal Count 1 – Violation of procedural due process under the Fourteenth Amendment of the U.S. Constitution.................................................... 15

    Federal Count 2 – Domestic terrorism under USA PATRIOT Act §802 and 18 U.S.C. §2331........................................................................... 16

    Federal Count 3 – Deprivation of rights under color of law under 18 U.S.C §242 and 42 U.S.C. §1983................................................... 17

    Federal Count 4 – Conspiracy against rights under 18 U.S.C. §241 and 42 U.S.C. §1985(3), with neglect to prevent under 42 U.S.C. §1986 .......... 18

    State Count 1 – Criminal profiteering by extortion under Penal Code §186 and Penal Code §518 ....................................................................... 18

    State Count 2 – Interference with university attendance under Penal Code §602.10 ........................................................................ 19

    State Count 3 – Willful and malicious interference with movement in public spaces under Penal Code §647c ..................................................... 19

State Count 4 – Administering a medical experiment in violation of informed
consent under Health and Safety Code §24175(a) ......................................20

State Count 5 – Practicing medicine without authorization under Business
and Professions Code §2052 ......................................................................22

State Count 6 – Conspiracy under Penal Code §182 ..............................................23

State Count 7 – Violation of the Unruh Civil Rights Act under Civil Code §51
and the Ralph Civil Rights Act under Civil Code §51.7 ..............................23

State Count 8 – Violation of express consent for testing of genetic material
under Civil Code §56.182 ..........................................................................23

State Count 9 – Violation of California Constitution, Article I, Section 1 ..............23

State Count 10 – Violation of Tom Bane Civil Rights Act under
Civil Code §52.1 for invading rights protected by the California and
U.S. Constitutions .....................................................................................24

CONCLUSION ....................................................................................................24

RELIEF ................................................................................................................25

EXHIBITS .............................................................................................................28

Exhibit 1 – County Order ....................................................................................28

Exhibit 2 – University Order ................................................................................32

Exhibit 3 – Disciplinary Procedures ....................................................................40

Exhibit 4 – Compliance Email .............................................................................46

Exhibit 5 – Exemption Denied..............................................................................51

Exhibit 6 – Costs of Attendance ..........................................................................53

## Jurisdiction and Venue

1. This complaint alleges federal civil rights violations against state officials acting under color of state law, invoking 42 U.S.C. § 1983. So, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and civil rights jurisdiction under 28 U.S.C §1343. Since this complaint also alleges state law violations arising under the same acts that created the alleged federal law violations, this Court has supplemental jurisdiction over California law in accordance with 28 U.S.C. §1367.

2. Also, this complaint adheres to the personal-injury statute of limitations applicable to federal 42 U.S.C §1983 suits within California.[1] Exhaustion of state judicial or administrative remedies is not required before filing a §1983 suit in federal court.[2]

3. All Defendants reside within the territory of the Central District of California. Since all alleged acts of Defendants occurred within the Central District, this Court is a proper venue and has personal jurisdiction over all Defendants in accordance with 28 U.S.C. §1391(b) and (c).

## Parties

4. Plaintiff Elijah Behringer was enrolled in 2019 as an electrical engineering student at California Polytechnic State University of San Luis Obispo (Cal Poly) before he was barred from attending classes in 2022. He lives in San Bernardino County.

5. Defendant Cal Poly is the university Elijah was attending. It is located at 1 Grand Avenue, San Luis Obispo, CA 93407 in San Luis Obispo County. Representatives for Cal Poly can be contacted at (805) 756-6000.

---

*1.* City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 124, 125 S. Ct. 1453, 1460, 161 L. Ed. 2d 316 (2005)

*2.* Monroe v. Pape, 365 U.S. 167, 183, 81 S. Ct. 473, 482, 5 L. Ed. 2d 492 (1961), overruled by Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)

6.      Defendant Jeffrey Armstrong is the President of Cal Poly. He is responsible for university administration and can create policies for students and faculty to follow. His office is at Cal Poly's Building 1, Room 407 and can be reached by phone at (805) 756-6000 or by email at "presidentsoffice@calpoly.edu".

7.      Defendant Tina Hadaway-Mellis is Assistant Vice-President for Campus Health & Wellbeing at Cal Poly. She oversees the medical services available on campus. Her office is at Building 27, Room 173 and can be reached by phone at (805) 765-1211 or by email at "thadaway@calpoly.edu".

8.      Defendant Valla Hardy is Lead Coordinator for COVID Help at Campus Health & Wellbeing. She supervises compliance with COVID-19 orders. She can be reached by phone at (805) 756-5471 or email at "vahardy@calpoly.edu".

9.      Defendant Amy Gode is Assistant Director of the Disability Resource Center at Cal Poly. She helps accommodate students with disabilities and reviews exemptions from compliance with COVID-19 polices. Her office is at Building 124. She can be contacted by phone at (805) 756-1395 or email at "drc@calpoly.edu".

10.      Defendant San Luis Obispo County is a political subdivision of the state that provides municipal services, including law enforcement and public health services. It also implements programs on behalf of the state and federal government. Its Public Health Department, which is a subdivision of its Health Agency, oversees public health policy for the territory it covers, including Cal Poly and the town of San Luis Obispo. Its County Government Center is located at 1055 Monterey Street, San Luis Obispo, CA 93408. A representative for the County can be contacted at (805) 781-5000.

11.      Defendant Penny Borenstein is Director of Public Health for San Luis Obispo County. She oversees public health services such as food facility inspection. In the case of a health emergency, she is tasked with overseeing the response to the emergency. A representative for Public Health can be contacted at (805) 781-5500.

## Introduction

12. Plaintiff Elijah Behringer was a student attending Cal Poly. After attending school for two years, he was denied access to classes and university facilities in January of 2022. University administration, with the support of state and county officials, cited a "COVID-19 emergency" and issued orders declaring that all students must wear a cloth or plastic mask over their nose and mouth during class and undergo either COVID-19 vaccination or routine collection of genetic material for COVID-19 testing. Elijah refused and was denied access to his education indefinitely.

13.     So, Elijah Behringer sues Cal Poly; Cal Poly University President Jeffrey Armstrong; University Administrators Tina Hadaway-Mellis, Valla Hardy, and Amy Gode; San Luis Obispo County; and County Health Officer Penny Borenstein for violating Elijah's federal and state rights under sham application of state law and authority.

## Facts Presented

14. In 2020, the Governor of California, Gavin Newsom, declared that California was in an indefinite state of emergency due to a COVID-19 pandemic.[3]

15.     In 2021, the CDC declared the existence of a COVID-19 "delta variant" and claimed that people unvaccinated with a COVID-19 vaccine were spreading disease and causing a surge of COVID cases.[4]

16.     Elijah Behringer was a student at California Polytechnic State University, San Luis Obispo (also known as Cal Poly). He had been enrolled since 2019.

---

3. *See* https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/, *also available at* https://tinyurl.com/mu3u3w2d

4. *See* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/09172021.html, *also available at* https://tinyurl.com/2uu83am4

17.     Under the American Rescue Plan Act of 2021 passed by the U.S. Congress, tens of billions of dollars were given to "public and private [educational] institutions" for purposes which included "implement[ing] evidence-based practices to monitor and suppress coronavirus in accordance with public health guidelines."[5]

18.     Citing a surge of positive COVID-19 tests in August of 2021, Penny Borenstein, Director of Public Health for San Luis Obispo County, issued an order declaring that in all indoor public settings within the territory of San Luis Obispo County, all Californians must wear face masks and follow any additional "Emergency Temporary Standards" set forth by the California Division of Occupational Safety and Health (Cal/OSHA).[6]

19.     So, Penny's order claimed to apply to students at Cal Poly, including Elijah.

20.     In addition, Cal Poly President Jeffrey Armstrong issued his own Presidential Order to go into effect on October 14, 2021.[7]

21.     The Presidential Order demanded that all on-campus students wear a mask completely covering the nose and mouth when indoors or be banned from accessing campus spaces and services (see pages 34 and 35).

22.     The Order demanded that all on-campus students must submit a Student Vaccination Status Reporting Form (see page 34).

23.     The Order demanded that all on-campus students who refused to submit a Student Vaccination Status Reporting Form or indicated on the Form that they did not receive a COVID-19 vaccine must submit to COVID-19 testing once every three days.

24.      COVID-19 tests require the collection of a student's genetic material, such as a saliva or mucus sample (see page 36).

---

5. *See pages 3 and 4 of document at* https://www2.ed.gov/about/offices/list/ope/arpfaq.pdf, *also available at* https://tinyurl.com/58ds87mp

6. *See the county's order as* **Exhibit 1** attached to this complaint on page 28.

7. *See the university Presidential Order as* **Exhibit 2** on page 32.

25. The Order demanded that those students who are unvaccinated yet refuse to submit to COVID-19 testing be banned from accessing campus spaces and services.

26. The Order demanded that banned or "non-compliant" students be tracked with a color-coded "campus pass" system (see page 38).

27. In addition, the University Office of Student Rights and Responsibilities (OSRR) ordered faculty to tell "non-compliant" students attempting to attend class to leave.[8]

28. The OSRR instructed faculty to deal with students who refused to leave by calling the police to force any "non-compliant" students out of the classroom (see page 43).

29. After skipping his enrollment for September of 2021, Elijah planned to return to school in January of 2022.

30. In December of 2021, Elijah was sent an email from Tina Hadaway-Mellis, Assistant Vice-President for Campus Health and Wellbeing, and Valla Hardy, Lead Coordinator for COVID Isolation, Quarantine, and Compliance Support.[9]

31. The email from Tina and Valla demanded that Elijah participate in an ongoing COVID-19 testing program to attend class or be banned due to non-compliance.

32. Elijah refused to be injected with a COVID-19 vaccine, wear a mask over his face, or submit to COVID-19 testing.

33. So, Elijah requested an exemption to allow him to go to class.

34. In early January of 2022, Elijah was denied his exemption request in an email from Assistant Director of the Campus Disability Resource Center, Amy Gode.[10]

35. Suspended from his university indefinitely, Elijah went on leave of absence.

36. Elijah had attended Cal Poly for two years, left with costs totaling $41,433.19.[11]

---

8. See the disciplinary procedures as **Exhibit 3** on page 40.

9. See the compliance email as **Exhibit 4** on page 46.

10. See the exemption denial as **Exhibit 5** on page 51.

11. See the costs incurred for attending Cal Poly as **Exhibit 6** on page 53.

**Preliminary Issues of Law Presented**

37. Before discussing specific counts, first we have two issues of law to dissect:

1) Was there a state of emergency authorizing county officials and university administration to enact emergency COVID-19 orders for students to follow?

2) Were those who proclaimed or enforced the orders protected from legal liability?

**First Preliminary Issue of Law – Was there a state of emergency authorizing county officials and university administration to enact emergency COVID-19 orders for students to follow?**

38. The rationale behind the COVID-19 orders revolved around the concept of public health. Under the impending threat of a "COVID-19 pandemic," state officials and university administrators issued a panoply of public health orders for the public to obey (see Exhibits 1 through 5 starting on page 28). In this context, did the threat of a pandemic justify these orders as an invocation of legitimate emergency power?

39. No. Only the California Legislature is permitted to pass laws or delegate authority in declaration of an emergency.[12] State officials other than legislators are forbidden from creating new law or declaring public health emergencies no matter the circumstance, except as permitted within the regulatory authority conferred by legislation such as the California Emergency Services Act. Yet this authority is constrained by the California Constitution.[13]

40. Since the Legislature is expressly forbidden by the California Constitution from delegating its lawmaking power to the governor, the California Emergency Services Act only grants the governor regulatory powers over the people within his purview as state officials, not over all people of California.[14] The scope of the governor's regulatory

---

12. California Constitution, Article IV, Section 8(d), *also see* Hess Collection Winery v. Agric. Lab. Rels. Bd., 140 Cal. App. 4th 1584, 1604, 45 Cal. Rptr. 3d 609, 623 (2006)

13. Government Code §8574, *Chapter not to limit constitutional or statutory powers*

14. Government Code §8571, *Suspension of statutes, rules, and regulations*

powers is to set policy only for the agencies he oversees, like a CEO of a company may designate company policy only for his employees.[15] Likewise, the governor of California, and all agency officials under his purview, including those of the California Department of Public Health (CDPH) and the California Division of Occupational Safety and Health (Cal/OSHA), are bound to faithfully enforce the law the Legislature enacts[16] and cannot unilaterally declare "mandates," emergency "standards," or regulatory "orders" applicable to the citizens of California or the general public.[17]

41.     A California appellate court attempted to overturn a trial court's ruling that the governor's emergency COVID-19 orders were unlawful. The appellate court tried to justify the governor's orders as being within his authority since the California Emergency Services Act "empowers the legislature to declare the emergency terminated" as an adequate "safeguard" against unlawful delegation of power.[18] But the California Constitution is clear on this matter. Its provisions are "mandatory and prohibitory."[19] If a provision requires that both houses of the Legislature must convene to declare any "urgency statutes" for "preservation of the public peace, health, or safety,"[20] it certainly follows that a single governor is prohibited from declaring any emergency public health law by himself, regardless of whether legislators can terminate the governor's declarations.

42.     Also, non-governmental organizations, foreign governments, international governments, or intergovernmental organizations have no jurisdiction over the

---

15. Government Code §12010, *Supervision of executive and ministerial officers*

16. California Constitution, Article V, Section 1

17. California Constitution, Article III, Section 3

18. Newsom v. Superior Ct., 63 Cal. App. 5th 1099, 1118, 278 Cal. Rptr. 3d 397, 410 (2021), review denied (Aug. 11, 2021)

19. California Constitution, Article I, Section 26

20. California Constitution, Article IV, Section 8(d)

sovereign State of California and cannot declare emergencies or legislate for the State. The World Health Organization (WHO) has no authority over the State or its Legislature. Officials of federal administrative agencies, including those of the HHS, FDA, and CDC, also cannot legislate or declare emergencies for the State of California[21] or any other state, regardless of any existence of a COVID-19 emergency.[22]

43.     Regarding evidence of a COVID-19 pandemic itself, it is perhaps surprising that there is disagreement on whether the virus that caused the alleged pandemic actually exists. In February of 2020, Dr. Nancy Messionier, who was director of the National Center for Immunization and Respiratory Diseases at the CDC, stated at a press conference regarding detecting human cases of COVID-19 that "[US laboratories] had developed this [COVID-19] test kit *before there were US cases*. We developed it based on the posted genetic sequencing [emphasis added]."[23] This concept of "genetic sequencing" as well as other methods for proving the existence of pathogenic viruses have been the subject of harsh criticism of virology.[24] Methods for proving the existence of the COVID-19 virus have not escaped this criticism.[25]

44.     In any case, proof of a COVID-19 emergency should have been subject to debate and discussion before policymakers in the California Legislature. Even so, to take any action, the Legislature would have required *irrefutable* evidence of emergency circumstances compelling that new laws be passed in order to protect safety and

---

21. U.S. Constitution, Amendment X

22. Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin., 211 L. Ed. 2d 448, 142 S. Ct. 661, 665 (2022)

23. *See* https://www.cdc.gov/media/releases/2020/t0228-COVID-19-update.html, *also available at* https://tinyurl.com/3dmn4w4v

24. *See* https://blog.nomorefakenews.com/2022/12/30/how-are-viruses-discovered-and-identified-in-the-first-place-2/, *also available at* https://tinyurl.com/5t3xwv4y

25. *See* https://blog.nomorefakenews.com/2020/10/22/the-virus-that-isnt-there-genetic-sequencing-and-the-magic-trick/, *also available at* https://tinyurl.com/3mebhuas

property[26]—especially if the new laws would outlaw or punish behavior that was previously lawful and commonplace.

45.     In the instance of the COVID policy debacle, official evidence surely wasn't provided to validate any pseudo-legal public health "regulations." The requirement of proof to justify emergency pandemic procedures should never be dodged on a pretense of "rapidly evolving circumstances" while tossing boundless power to the governor to arbitrate COVID-19 policy on his own accord.

46.     The function of legislators is to scrutinize proposed policy before its enactment as law. Neither good intentions nor subterfuge from public health officials should substitute for this scrutiny. In the State of California, the exclusive lawmaking power of the California Legislature derives from the inherent political power of the people[27] in order to protect public health and safety.[28] Since the Legislature's power to declare "urgency statutes" was never invoked to recognize a state public health emergency, the alleged COVID-19 emergency and the powers therefrom never existed with legitimacy.

**Second Preliminary Issue of Law – Were those who proclaimed or enforced the university and county COVID-19 orders protected from legal liability?**

47. The orders of San Luis Obispo County and Cal Poly administration required that students must wear a mask and receive either a COVID-19 vaccine or submit to collection and testing of genetic material to ostensibly control the COVID-19 pandemic (see Exhibit 1 on page 28 and Exhibit 2 on page 32). These orders involved three different types of medical devices: face masks, COVID-19 tests, and COVID-19 vaccines. Were the public health orders and their enforcers protected from liability of state and federal law regarding use of each of these three medical devices?

---

26. Ex parte Blaney, 30 Cal. 2d 643, 657, 184 P.2d 892, 901 (1947)

27. California Constitution, Article II, Section 1

28. California Constitution, Article I, Section 1

48.     All students were required by university orders to wear face masks indoors. Face masks, including cloth masks, were permitted by the FDA under Emergency Use Authorization (EUA) for use by the public to act as source control for the pandemic.[29] The EUA was issued to allow those who directly or indirectly administer face masks or other devices designed to control the pandemic to be immune to legal liability.[30]

49.     But the EUA legal immunity is not unlimited and does not cover "willful misconduct" regarding use of medical devices. For example, informed consent is a principle in medical ethics that a patient must have sufficient information and understanding before making decisions about their medical care. In accordance with this principle, the potential recipient of medical treatment must always have the option to refuse medical treatment without adverse consequences, such as being fired from their job or barred from attending a public university. Federal law doesn't allow violating informed consent for medical treatment,[31] including treatment with EUA medical devices.[32] Termination of university enrollment due to refusal to wear a medical device negates informed consent for medical treatment.

50.     As a supplement to mask-wearing, students were strong-armed into undergoing routine COVID-19 testing (see page 36). This testing of students involves sampling and replicating genetic material for the purpose of detecting COVID-19 virus. Like EUA-authorized face masks, the COVID-19 tests are also issued under EUA from the FDA

---

29. *See* https://www.fda.gov/medical-devices/emergency-situations-medical-devices/faqs-emergency-use-authorization-face-masks-non-surgical, *also available at* https://tinyurl.com/2vudmp79

30. *See section VII labeled "Liability Protection" at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities, *also available at* https://tinyurl.com/nhbw2se6.

31. Title 42, U.S.C. §3515b, *Prohibition on funding certain experiments involving human participants*

32. Title 21, U.S.C. §360bbb-3(e), *Authorization for medical products for use in emergencies – conditions of authorization*

and require informed consent.[33] Yet informed consent was disregarded here too, as university policy threatened to discipline students if they tried to attend class without permitting Cal Poly to harvest their bodily fluids and analyze their genetic information.

51.     Lastly, Cal Poly students were ordered to either undergo mandatory testing or receive a COVID-19 vaccine. There is no immunity from legal liability for people who directly or indirectly administer COVID-19 vaccines in violation of informed consent, whether the vaccines are licensed as "fully approved" by the FDA or issued under EUA. Use of any kind of medical device requires informed consent from the patient to comply with federal law (see footnotes 31 and 32). In addition, the California Protection of Human Subjects in Medical Experimentation Act forbids violating informed consent for experimental medical devices used in treatment (see paragraph 69 on page 20). The FDA regards all vaccines, approved or not, as experimental medical devices:

> "It is important to note that a vaccine is a drug. Like any drug, vaccines have benefits and risks, and even when highly effective, no vaccine is 100 percent effective in preventing disease or 100 percent safe in all individuals…. Although the vaccine development process and FDA's evaluation are rigorous and comprehensive, there is still a need for ongoing surveillance [experimentation] of vaccines after FDA-approval to identify uncommon adverse events or long-term complications that may occur, and sometimes to monitor effectiveness."[34]

---

33. *See* https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/in-vitro-diagnostics-euas, *also available at* https://tinyurl.com/bdepwztk

34. *See* section *"FDA Oversight Continues After Approval" at* https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/vaccine-development-101, *also available at* https://tinyurl.com/m5akur68

52. So, all vaccines, regardless of "full approval" or "emergency use authorization," are experimental medical drugs and require informed consent for use on a patient. Indeed, no vaccination—let alone by a "COVID vaccine"—may be legally required of a student to attend public universities or schools. So, of the medical devices and procedures that county and university administration ordered students to submit to or lose their education, none of the devices or procedures were directed to be appropriately used in a manner consistent with state or federal law.

**List of Counts**

53. Now that it is established that the orders of San Luis Obispo County and Cal Poly cannot be saved by some special exception from the scrutiny of the law, the Plaintiff, Elijah Behringer, presents his counts to this Court. This section applies the facts from the **Facts Presented** section of this complaint (¶¶ 14–35) to specific law violations. Each count is alleged against all Defendants.

### Federal Count 1 – Violation of procedural due process under the Fourteenth Amendment of the U.S. Constitution

54. Elijah was forbidden from attending class without a "campus pass" certifying that he had undergone genetic testing twice weekly. He was also ordered to wear a surgical mask or a piece of cloth fitted snug over his nose and mouth. If he had only received an injectable drug—a "COVID-19 vaccine"—he would have been able to attend class without the burden of the COVID tests required by university orders (see Exhibits 2 through 5 starting on page 32). When Elijah rejected the demands of all these orders, did the university comport with due process by indefinitely suspending him or barring his access to class?

55. No. Of the California Code of Regulations, Title 5 §41301 explains the reasons which may justify denial of access to classes, or suspension. The regulation details that suspension may be justified if a student violates a university presidential order or

prevents a "public safety officer" from carrying out duties. But any emergency public health order was null under law and could be ignored with legal impunity.[35] Given that no legitimate public health emergency existed, there were no legitimate "public safety officer" duties to be interfered with and thus no good reason to suspend Elijah.

56.     In any case, Elijah was entitled to a notice and a hearing from Cal Poly administrators before loss of his university education.[36] A formal hearing where he could voice his complaints and rebut the decision to ban him from class was never entertained. So, under a façade of authority, his denial of access to class violated the requirement of procedural due process expected from state public officials under the Fourteenth Amendment of the U.S. Constitution.[37]

### Federal Count 2 – Domestic terrorism under USA PATRIOT Act §802 and 18 U.S.C. §2331

57.  Activity of domestic terrorism under 18 U.S.C. §2331 includes the elements of:

(1) acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, while

(2) occurring primarily within the territorial jurisdiction of the United States, with

(3) intent to intimidate or coerce a civilian population.

58.     The term "population" generally refers to the total number of individuals within an entire geographical area or political jurisdiction. Health Officer Penny Borenstein decreed that the entire population of San Luis Obispo County submit to wearing face masks and other "Emergency Temporary Standards" or suffer business and school closure (see Exhibit 1 on page 28). In lockstep with Penny's order, Cal Poly President

---

35. Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147, 151, 89 S. Ct. 935, 939, 22 L. Ed. 2d 162 (1969)

36. Esteban v. Cent. Missouri State Coll., 415 F.2d 1077, 1089 (8th Cir. 1969)

37. Roger M. Beverage, *Colleges and Universities - Section 1983, Procedural Due Process and University Regulations: Any Relationship*, 49 NEB. L. REV. 689 (1970).

Jeffrey Armstrong and his gang of administrators, including Tina Hadaway-Mellis, Valla Hardy, and Amy Gode, either demanded or enforced that the whole population of Cal Poly students, staff, and faculty feign consent to a legion of medical procedures or be denied access to the public university (see page 32, Exhibits 2 through 5).

59.    Under the pretense of a public health emergency, the Defendants—however mistaken they may have been in their perceived authority—teamed up to terrorize and coerce an entire civilian population, including Elijah, into cutting off their breathing airways with cloth and plastic material for extended periods of time, presenting their bodily fluids to be harvested for genetic analysis, and receiving injected drugs which have inherent risks of harm to the heart and body.[38]

**Federal Count 3 – Deprivation of rights under color of law under 18 U.S.C §242 and 42 U.S.C. §1983**

60. The elements of a deprivation of rights under color or pretense of law under 18 U.S.C. §242 and 42 U.S.C. §1983 include:

(1) Using color or pretended authority of any state statute, ordinance, regulation, custom, or usage;

(2) to deprive anyone within the jurisdiction of the United States;

(3) of rights secured by the U.S. Constitution or laws of the United States.

61.    The orders issued by Health Officer Penny Borenstein and Jeffrey Armstrong both cited regulations of state agencies out of context in an attempt to justify invasion of individual liberties protected by federal and state law (see page 29 and page 39). Since representatives of both Cal Poly and San Luis Obispo County promulgated and adopted orders which violated civil rights under pretense of state law, both corporate entities

---

*38. See* https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html, *also available at* https://tinyurl.com/4uu9kayj

may be held liable.[39] Also, individuals may not claim immunity from liability under 42 U.S.C. §1983 when the unlawfulness of their actions is beyond debate.[40]

### Federal Count 4 – Conspiracy against rights under 18 U.S.C. §241 and 42 U.S.C. §1985(3), with neglect to prevent under 42 U.S.C. §1986

62. Under 18 U.S.C. §241 and 42 U.S.C. §1985(3), a conspiracy against rights includes two or more people acting together to deprive someone of rights secured by the laws of the United States or the U.S. Constitution. Under 42 U.S.C. §1986, there is also liability for every person who has knowledge of a conspiracy against rights yet neglects to prevent the conspiracy when they have the power to do so.

63. The Defendants Cal Poly, Jeffrey, Tina, Valla, Amy, San Luis Obispo County and Penny acted in concert to deprive Elijah of his rights (page 28, Exhibits 1 through 5).

### State Count 1 – Criminal profiteering by extortion under Penal Code §186 and Penal Code §518

64. "Extortion" is obtaining of anything by illegal compulsion. Elements of the crime of attempted extortion under Penal Code §518 are:

1) specific intent to commit extortion, and

2) direct ineffectual act done towards its commission.[41]

65. "Criminal profiteering activity" under Penal Code §186 generally means a coercive act or threat made for gain or advantage, such as extortion. Further, a "pattern of criminal profiteering activity" means engaging in at least two incidents of criminal profiteering that meet the following requirements:

---

*39.* Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611, 17 Fair Empl. Prac. Cas. (BNA) 873, 16 Empl. Prac. Dec. (CCH) P 8345 (1978)

*40.* Rice v. Morehouse, 989 F.3d 1112, 1125 (9th Cir. 2021)

*41.* People v. Ochoa, 2 Cal. App. 5th 1227, 1231, 207 Cal. Rptr. 3d 181, 184 (2016)

1) Have the same or a similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics.

2) Are not isolated events.

3) Were committed as a criminal activity of organized crime.

66.  By extorting tens of thousands of students, staff, and faculty into undergoing invasive medical procedures in exchange for government funding, Cal Poly acted as an apparatus of organized crime (see paragraph 17 and footnote 5 on page 7, Exhibit 2 on page 32, and Exhibit 3 on page 40). The only legitimate purpose of government is to protect property ownership, including the sanctity of the body. Neither San Luis Obispo County nor Cal Poly had any legitimate interest in using medical devices to molest massive numbers of people—with no basis in any intelligible emergency.

### State Count 2 – Interference with university attendance under Penal Code §602.10

67. Under Penal Code §602.10, no person may, by physical force and with the intent to prevent attendance or instruction, willfully obstruct or attempt to obstruct any student or teacher seeking to attend or instruct classes at any of the California State University campuses, including Cal Poly (see Exhibit 3 on page 43).

### State Count 3 – Willful and malicious interference with movement in public spaces under Penal Code §647c

68. Under Penal Code §647c, no person may willfully and maliciously obstruct the free movement of any person on any street, sidewalk, public place, or in any building open to the public. One acts maliciously within the meaning of this section if he deliberately and intentionally obstructs access to a public space.[42] Neither Cal Poly nor the County

---

42. *People v. Man*, 39 Cal. App. 3d Supp. 1, 5, 114 Cal. Rptr. 237, 239 (App. Dep't Super Ct. 1974)

had any authority to obstruct or regulate movement in public spaces due to a "COVID-19 emergency" that didn't exist (page 28, Exhibits 1 through 3).

### State Count 4 – Administering a medical experiment in violation of informed consent under Health and Safety Code §24175(a)

69. Medical experiments require informed consent under Health and Safety Code §24175(a). All Defendants are liable under §24176.

70.     In a ruling related to §24175(a), a California appellate court attempted to rationalize disregarding informed consent for vaccination. The court argued that vaccination is beneficial, so it is not defined as a "medical experiment" in Health and Safety Code §24174. The appellate court reasoned that it is within the "police power" to coerce people to vaccinate by law since it is "common knowledge" that vaccines eradicate and "[prevent] the spread of contagious diseases."[43]

71.     But vaccination may not stop contagion or transmission of disease to other people. Vaccines aren't necessarily designed or tested for that purpose either. For example, at a public hearing, European Parliament Member Rob Roos asked a Pfizer executive, "Was the Pfizer COVID vaccine tested on stopping the transmission of the virus before it entered the market?" Pfizer's president of international markets Janine Small replied with "No … You know, we had to … really move at the speed of science to know what is taking place in the market."[44] So, even modern COVID vaccines may not protect others.

72.     In addition, claims that widespread diseases were eradicated with vaccination alone probably deserve a closer look. The combined death rate from scarlet fever, diphtheria, whooping cough, and measles among children up to fifteen shows that nearly 90

---

*43.* Brown v. Smith, 24 Cal. App. 5th 1135, 1146, 235 Cal. Rptr. 3d 218, 226 (2018)

*44. See* https://twitter.com/rob_roos/status/1579759795225198593, *also available at* https://tinyurl.com/4ma8phfn

percent of the total decline in mortality between 1860 and 1965 had occurred before the introduction of antibiotics and widespread immunization.[45] Some scholars, like Ivan Illich in his work *Medical Nemesis*, have attributed historical decreases of disease prevalence to factors wholly independent of vaccines, such as improved nutrition and sewage treatment.

73.   Quite the opposite of eradication, some have observed that vaccination may create the disease it is designed to prevent. For example, polio vaccine inventor Jonas Salk pointed out in 1977 that "The live (Sabin) poliovirus vaccine has been the predominant cause of domestically arising cases of paralytic poliomyelitis in the United States since 1972. To avoid the occurrence of such cases, it would be necessary to discontinue the routine use of live poliovirus vaccine."[46] Also, in the context of COVID, and despite authoritative assurances of vaccine safety and efficacy, there are even organizations claiming to search for treatments and cures for *disease caused by* COVID-19 *vaccines*.[47, 48]

74.   With 4.9 billion dollars in damages paid out to Americans over vaccine injury,[49] there is certainly some doubt to be sown about the science of vaccination as an infallible

---

45. R. R. Porter, *The Contribution of the Biological and Medical Sciences to Human Welfare*, Presidential Address to the British Association for the Advancement of Science, Swansea Meeting, 1971 (London: the Association, 1972), p. 95. *Accessible at* https://worldcat.org/title/650252, *same link available at* https://tinyurl.com/44rvsc4j

46. Jonas Salk, *Control of Influenza and Poliomyelitis with Killed Virus Vaccines*, Science, March 4, 1977, p. 845. *Accessible at* https://www.science.org/doi/10.1126/science.320661, *same link available at* https://tinyurl.com/bdyfw29j

47. *See* https://react19.org/donatetoresearch/, *also available at* https://tinyurl.com/bdffn328

48. *See* https://covid19criticalcare.com/treatment-protocols/i-recover/, *also available at* https://tinyurl.com/yckekw25

49. *See* https://www.hrsa.gov/vaccine-compensation/data, *also available at* https://tinyurl.com/ms6y8enf

cure-all.[50] "Science" is not a peremptory state of facts. Science is an unceasing process of ascertaining truth from fiction. Widespread scientific beliefs that are "common knowledge"—bouncing about in an echo chamber of public-spirited theory—can melt away fast when laid bare before the fire of scrutiny.

75.     Likewise, beliefs advocating for the wisdom of coerced vaccination may fail to withstand scientific inquiry. So, despite the ruling of *Brown v. Smith* (see footnote 43), all Defendants are liable under Health and Safety Code §24175(a) for disregarding informed consent requirements for vaccination, an experimental medical treatment.

**State Count 5 – Practicing medicine without authorization under Business and Professions Code §2052**

76.  Under Business and Professions Code §2052, anyone on behalf of government who attempts to give medical treatments must have certification. Individuals without authorization in accordance with a certificate or license authorizing them to give medical treatment may be held liable. A defendant may not claim that they did not intend to violate this statute as a defense. Also, failure to obtain informed consent from a patient prior to any medical procedure is a form of professional negligence.[51]

77.     There is simply no authorization or certification allowing Cal Poly, San Luis Obispo County, Jeffrey Armstrong, Tina Hadaway-Mellis, Valla Hardy, Amy Gode, or Penny Borenstein to order or enforce medical treatments of bodily fluid testing, masking, or vaccination for massive numbers of people as conditions for access to public services (see Exhibits 1 through 5 starting on page 28).

---

50. *See* https://blog.nomorefakenews.com/2022/04/27/vaccines-beneath-the-surface/, *also available at* https://tinyurl.com/56bfcv2j

51. Davis v. Physician Assistant Bd., 66 Cal. App. 5th 227, 276, 281 Cal. Rptr. 3d 207, 246 (2021)

**State Count 6 – Conspiracy under Penal Code §182**

78. If two or more people act together to commit crime, they are liable under Penal Code §182. All Defendants are liable under this statute.

**State Count 7 – Violation of the Unruh Civil Rights Act under Civil Code §51 and the Ralph Civil Rights Act under Civil Code §51.7**

79. Under the Unruh Civil Rights Act of Civil Code §51 and the Ralph Civil Rights Act of Civil Code §51.7, all public accommodations, including public universities, may not discriminate against people or refuse service based on arbitrary medical classifications or genetic information. All Defendants acted together to enforce medical orders that discriminated against certain students, whether by refusing service based on wearing of a cloth or plastic mask, vaccination, or testing of genetic material. Students who refused to comply were threatened with use of police force (see Exhibit 3 on page 43).

**State Count 8 – Violation of express consent for testing of genetic material under Civil Code §56.182**

80. Under Civil Code §56.181(e), a person or public entity shall not discriminate against a consumer for exercise of express consent or refusal to genetic testing under Civil Code §56.181(a)(2). All Defendants violated these codes and are liable under Civil Code §56.182 (see page 31 of Exhibit 1 and page 36 of Exhibit 2).

**State Count 9 – Violation of California Constitution, Article I, Section 1**

81. Article 1, Section 1 of the California Constitution states that "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." The Defendants invaded Elijah's liberty,

his property interest in his continuing education, and his privacy interest in his medical autonomy.[52]

82.    The argument of expediency cannot justify the invasion of any fundamental and constitutional right.[53] Additionally, encroachments on the liberty of the citizen cannot be tolerated even though the general result sought is a beneficent one.[54]

### State Count 10 – Violation of Tom Bane Civil Rights Act under Civil Code §52.1 for invading rights protected by the California and U.S. Constitutions

83. Those that invade rights protected by the California or U.S. Constitutions by threat, intimidation, or coercion are liable under Civil Code §52.1 for violation of the Tom Bane Civil Rights Act. Under California law, a municipality or corporation may be included as a "person" for purposes of this Act.[55] So, all Defendants are liable.

### Conclusion

84. Even if the public health orders were for the benefit of Elijah's health and safety, there would be no need to compel compliance. As an ancient legal maxim puts it: *Beneficium invito non datur* or "A privilege or benefit is not granted against a person's will."[56]

85.    Yet the public health orders had no evident benefits. On the contrary, they worked to browbeat people into sacrificing their inherent sovereignty at the altar of medical-themed neuroticism. The only time freedom should ever be constrained is to "deter the individual from committing acts that injure society by harming others, their property,

---

52. Norman-Bloodsaw v. Lawrence Berkeley Lab'y, 135 F.3d 1260, 1269 (9th Cir. 1998)

53. Dorsey v. Barba, 226 P.2d 677, 688 (Cal. Ct. App. 1951), vacated, 38 Cal. 2d 350, 240 P.2d 604 (1952)

54. Ex parte Arata, 52 Cal. App. 380, 385, 198 P. 814 (Cal. Ct. App. 1921)

55. Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1117 (E.D. Cal. 2012)

56. LEGAL MAXIMS, Black's Law Dictionary (11th ed. 2019)

or the public welfare."[57] Was there ever any evidence presented to prove that any kind of "COVID-19 order" would deter harm to others? No. Threatening populations into wearing suffocating material and getting injected with laboratory concoctions doesn't only fail to preserve the public welfare, it is *catastrophic* to the public welfare. Likewise, those people who assaulted Elijah's freedom and terminated his education—all while parroting hollow appeals to "science" and "safety"—have a lot to answer for.

**Relief**

86. Elijah directly incurred $41,433.19 in costs toward his degree before he was indefinitely banned from class (see page 54). In addition to the costs of wasted time and money, it has been said that the indirect costs of a suspension from university may be worse than those of some criminal convictions.[58] Further, Elijah was only one of about 24,000 students, staff, and faculty[59] who were subject to similar coercive treatment at Cal Poly. This magnitude of misconduct should be considered when assessing potential damage awards to deter these kinds of civil rights violations.

87.     Accordingly, Elijah requests that the issue of punitive damages and all other triable issues be submitted to a jury. The jury should be instructed to deter the undesirable behavior in this complaint by awarding damages which "send a message that this country's civil rights laws are vigorously enforced… despite the fact that [Defendants are employed by] government."[60] It has been held proper for a jury to award punitive

---

57. *People v. Roberts*, 2 Cal. 4th 271, 316, 826 P.2d 274, 298 (1992), as modified on denial of reh'g (May 20, 1992)

58. Roger M. Beverage, *Colleges and Universities - Section 1983, Procedural Due Process and University Regulations: Any Relationship*, 49 NEB. L. REV. 689 (1970), p. 699.

59. *See* https://calpolynews.calpoly.edu/quickfacts.html, *also available at* https://tinyurl.com/4m35sjnb

60. *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997)

damages which are more than 200 times the out-of-pocket expenses incurred by a plaintiff due to a defendant's oppressive or deceptive acts.[61]

88.　Lastly, to fully address any matters of public interest related to this complaint, a state grand jury should convene to "inquire into all public offenses… and present them to the court by indictment" under Penal Code §917 and fulfill its duty to "inquire into the willful or corrupt misconduct in office of public officers of every description within the county" under Penal Code §919(c). Additionally, a federal grand jury should investigate any federal matters of public interest related to this complaint.

89.　Now, on the issue of relief, Elijah requests:

    1) a jury trial on all triable issues,

    2) judgment against **Cal Poly, Jeffrey Armstrong, Tina Hadaway-Mellis, Valla Hardy, Amy Gode, San Luis Obispo County,** and **Penny Borenstein,** on all counts pleaded in the **List of Counts** within this complaint,

    3) compensatory damages of at least $41,433.19 (see total costs of attendance on page 54).

    4) threefold the compensatory damages in accordance with the civil remedies afforded to victims of terrorism under 18 U.S.C. §2333 as pleaded in this complaint under 18 U.S.C. §2331,

    5) a proper punitive damages award to deter the type of misconduct outlined in this complaint (see footnote 61),

    6) any applicable statutory damages or penalties,

    7) compensation for any fees and costs of suit, and

    8) any other relief found just and reasonable by this Court.

---

61. Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23–24, 111 S. Ct. 1032, 1046, 113 L. Ed. 2d 1 (1991), *ruled that a punitive damages award was proper, even though it was over 200 times as much as the actual out-of-pocket expenses inflicted by the opposing party's fraud.*

Dated: May 23, 2023

**DEMAND FOR JURY TRIAL**

I, Elijah Behringer, being duly sworn, do state and affirm according to law, that I have first-hand knowledge of the undisputed material facts and am competent to testify in these matters, and swear under penalty of perjury that these facts are true and correct.

I respectfully demand a trial by jury on all issues so triable. This demand is proper under Fed. R. Civ. Proc. 38 and the Seventh Amendment of the United States Constitution.

Elijah J. Behringer

behringerlaw@pm.me
PO Box 2973
Crestline, CA 92325
(909) 222-5370

# EXHIBIT 1

**ORDER NUMBER 6 OF THE COUNTY HEALTH OFFICER
REQUIRING FACE COVERINGS IN ALL PUBLIC INDOOR SETTINGS
ATTRIBUTABLE TO THE RISE IN SARS-CoV-2 DELTA VARIANT**

**Please read this order carefully. Violation of or failure to comply with this Order
is a public nuisance subject to citation, abatement, or both, as well as a
misdemeanor punishable by fine, imprisonment, or both. (California Health &
Safety Code § 120295 et seq.; California Pen. Code §§ 69 and 148(a)(1).)**

Since early 2021, the SARS-CoV-2 Delta variant has been circulating in San Luis
Obispo County. This variant is highly transmissible, especially in indoor settings and requires
multi-component prevention strategies to reduce spread. Despite rising vaccination rates, San
Luis Obispo County is experiencing high levels of community transmission due to the Delta
variant. While most COVID-19 cases are among unvaccinated residents, the proportion of
breakthrough cases is increasing. COVID-19 hospitalizations and intensive care unit (ICU)
admissions have reached an all-time high, primarily among unvaccinated persons. San Luis
Obispo County is also seeing a concerning uptick in cases among staff and residents in long-
term care facilities. The COVID-19 vaccines currently authorized in the US have been shown to
be highly safe and effective at providing protection to individuals and communities, particularly
against severe COVID-19 disease and death, and are recommended by the Centers for
Disease Control and Prevention (CDC) for all populations for whom the vaccine is authorized by
the US Food and Drug Administration. The San Luis Obispo County Health Officer ("Health
Officer") strongly recommends that all eligible persons in the County be vaccinated. Information
on obtaining a COVID-19 vaccine in San Luis Obispo County is available here:
RecoverSLO.org/Vaccine

On July 27, 2021, the CDC updated guidance for fully vaccinated people given new
evidence on the Delta variant. The CDC recommends that fully vaccinated persons wear a
mask in public indoor settings. On July 28, 2021, the California Department of Public Health
(CDPH) aligned its Guidance for the Use of Face Coverings with the CDC and recommends
universal masking in public indoor settings statewide. The CDC and CDPH also endorsed that
fully vaccinated people at higher risk for COVID-19 infection, as well as unvaccinated and not
fully vaccinated persons consider wearing a mask in non-public indoor settings. Household
transmission and small gatherings are major drivers of COVID-19 transmission in San Luis
Obispo County.

While vaccines remain the most effective tool against COVID-19, universal indoor use of
face coverings, also known as masking, is the least disruptive and most immediately impactful
additional measure to curb the spread of the virus and reduce intense pressure on the
healthcare system.

This Order is part of a strategy to support the continued operations of businesses,
activities, and schools. As of this date, the Health Officer strongly believes that schools can and
should remain open in full for in-person classes for all grades throughout the 2021/2022 school
year.

The Health Officer will continue to assess the public health situation as it evolves and
may modify this Order, or issue additional Orders, related to COVID-19, as changing
circumstances dictate.

NOW, THEREFORE, it is ordered as follows:

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, 120175, AND 120220, THE HEALTH OFFICER OF THE COUNTY OF SAN LUIS OBISPO HEREBY FINDS AND ORDERS:

1. Getting vaccinated against COVID-19 is the best way to protect the vaccinated person from infection, hospitalization, or death from COVID-19, as well as to prevent harm to others by reducing the risk of transmission of COVID-19. Therefore, all eligible persons are strongly urged to get vaccinated against COVID-19 as soon as possible.

2. Except as otherwise set forth herein, the July 28, 2021 Guidance for the Use of Face Coverings issued by the CDPH as may be amended from time to time, continues to apply throughout the County. (The guidance may be found at the following link: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/guidance-for-face-coverings.aspx)

3. This Order directs that face coverings shall be worn, regardless of vaccination status, over the mouth and nose, in all indoor public settings, venues, gatherings, and workplaces, such as, but not limited to offices, retail stores, restaurants and bars, fitness centers, theaters, museums, personal care services, family entertainment centers, conference centers and government offices serving the public.

4. Individuals, businesses, venue operators, hosts, and others responsible for the operation of indoor public settings must:

   - Require all patrons to wear face coverings for all indoor settings, regardless of their vaccination status; and
   - Post clearly visible and easy-to-read signage at all entry points for indoor settings to communicate the masking requirements to all patrons.

5. Exemptions from face covering requirements – Individuals are not required to wear face coverings in the following circumstances:

   - Persons working alone in a closed office or room;
   - Persons actively eating and/or drinking;
   - Persons swimming or showering in a fitness facility;
   - Persons obtaining a medical or cosmetic service involving the head or face for which temporary removal of the face covering is necessary to perform the service;
   - Persons specifically exempted from wearing face masks pursuant to other CDPH guidance, which may include students and other persons with medical or behavioral contraindications.

6. Employers and businesses subject to the Cal/OSHA COVID-19 Emergency Temporary Standards ("ETS") and/or the Cal/OSHA Aerosol Transmissible Diseases Standards should consult the applicable regulations for additional requirements. The ETS allow local health jurisdictions to mandate more protective measures. This

2

Order, which requires face coverings for all individuals in indoor settings and businesses, regardless of vaccination status, takes precedence over the more permissive ETS regarding employee face coverings.

7. All State orders and guidance documents referenced in State orders are complementary to this Order. By way of this Order, the Health Officer adopts such directives as orders as well. Where a conflict exists between a local order and any State public health order related to the COVID-19 pandemic, the most restrictive provision controls pursuant to, and consistent with, California Health and Safety Code § 131080.

8. This Order shall become effective Wednesday, September 1, at 12:01 a.m. and will continue to be in effect until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

9. Copies of this Order shall promptly be: (1) posted on all outside public access doors of the new County Government Center of the County of San Luis Obispo at 1055 Monterey Street in the City of San Luis Obispo; (2) made available via SLOPublicHealth.org (which will include a link to ReadySLO.org where the order will be posted) and (3) provided to any member of the public upon request of a copy of this Order.

10. If any provision of this Order or its application to any person or circumstance is held to be invalid, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED.**

Date: _8/31/2021_

Time: _4:20 pm_

PENNY BORENSTEIN, M.D.
County Health Officer

3

# EXHIBIT 2



OFFICE OF THE PRESIDENT

**SUPPLEMENTAL PRESIDENTIAL ORDER II**
**to above-cited *COVID-19 Presidential Order (Amended – December 31, 2020)***

**SUPPLEMENTAL PRESIDENTIAL ORDER II to above-cited *COVID-19 Presidential Order (Amended – December 31, 2020)***
**Posted: October 14, 2021**
**Effective: October 14, 2021**

**COVID-19 Student Safety Protocols - Fall 2021**

### I.   SUMMARY

As part of the University's ongoing and collective efforts to limit the spread of COVID-19 and the associated health and safety implications while continuing to value education, the University strategy for keeping ourselves and each other safe has four parts: 1) Vaccination — Everyone on campus must vaccinate or claim an exemption; 2) Face Covering — Everyone must wear a face covering indoors, except when doing so would be unsafe or impractical, with the exception of instructional faculty who are vaccinated, who may choose to wear a face shield and drape while teaching; gaiters and bandanas do not qualify as an acceptable face covering; 3) Hygiene and Daily Health Screening — Students must continue following good pandemic hygiene, including regularly washing or sanitizing hands, and monitoring their daily health symptoms; and 4) Testing — Free, on-campus testing is available for students, faculty, and staff, and unvaccinated/partially unvaccinated students must test regularly to help maintain campus health and safety.

This Presidential Order on COVID-19 Student Safety Protocols is a critical step to care for our campus and local community. The terms and conditions of this order are subject to change should public health conditions warrant different safety strategies and protocols. Any subsequent changes to this order will be communicated to the student body via a campus-wide email.

Compliance expectations and non-compliance outcomes specific to student vaccinations, face coverings, daily health screenings and campus pass, and testing are outlined below.
Failure to comply with these safety and mitigation measures could subject students to the University disciplinary process and sanctions, including but not limited to suspension and expulsion.

### II.   VACCINATION

a) Compliance Expectations

Currently enrolled students must submit a Student Vaccination Status Reporting Form to the University. This form provides for student to declare their COVID-19 vaccination status (whether fully or partially vaccinated or planning to vaccinate) or identify a medical or religious exemption, or indicate their exclusion due to no intent to access the campus or to participate in University events or programs. All residential students must submit the form by September 14, 2021, and off-campus students must do so by September 20, 2021, or their first day on campus, whichever comes first, to comply with the Cal Poly and California State University's (CSU) policies.

b) Noncompliance Outcomes

Currently enrolled students who do not complete the Student Vaccination Status Reporting Form by September 20, 2021, may be subject to the following:
   i) Ongoing testing, every three days with single sign-on restrictions for testing non-compliance; this requirement may change depending on public health conditions
   ii) Registration hold for winter quarter

   Students who claimed an exclusion because they are not intending to access campus for in-person classes or services and will not participate in University events or programs will not be able to access the daily symptom screener and therefore will not have access to a campus pass. At any time, students can go to the COVID-19 tab on the student portal to update/change their Student Vaccination Status Reporting Form.

## III.   FACE COVERING

a) Compliance Expectations

All students accessing any indoor facility on campus must wear a face covering, regardless of their vaccination status.

Acceptable face coverings must:
   • Completely cover the nose and mouth.
   • Fit snugly against the side of the face with secured ties/ear loops.
   • Allows for adequate breathing.
   • Be clean and undamaged.

Face covering exemptions include when students are indoors within their University residential assignment (including those with roommates) and complying with University Housing guest policies, or when participating in University-related intercollegiate athletic events (unless otherwise mandated). Student-athletes must comply with all COVID-19 safety protocols applicable to college athletics, regardless of vaccination status. Face coverings may be removed for a minimum timeframe while actively eating or drinking in campus spaces that do not have a "no eating/drinking" policy.

b) Non-compliance Outcomes

Students not wearing an acceptable face covering or not wearing it properly will experience progressive discipline including the following:

   i) The student will be asked to comply.  If the student does not have a face covering, the student will be given a face covering or asked to get one from the nearest sanitation station before using the campus space or service,

   ii) The student will be given a verbal warning,

   iii) The student will be asked to leave the premises (such as a classroom, lab, or dining facility), and/or

   iv) The student's name will be reported to the Office of Student Rights and Responsibilities (OSRR) with subsequent discipline as per OSRR student conduct policy.

## IV.   DAILY HEALTH SCREENING AND CAMPUS PASS

a)   Compliance Expectations

Prior to arriving on any University property or participating in any University- related activity, all students, regardless of vaccination status, must conduct a daily personal health screening and self-monitor for COVID-19- related symptoms such as sore throat, fever, cough, shortness of breath, or other symptoms of respiratory illness. Visit the Centers for Disease Control website for information about COVID-19-related symptoms.

Those experiencing COVID-19 related symptoms will be assigned a red campus pass and should not attempt to access campus spaces or services except for Campus Health and Wellbeing. Students who develop COVID-19 related symptoms while on University property or participating in any University-related activity must remove themselves from all University-related activities immediately. If the symptomatic student is an on-campus resident, they should go to Campus Health and Wellbeing during hours of operation.  Symptomatic students who live off campus should go to Campus Health and Wellbeing during hours of operation or leave campus and visit an off-campus healthcare provider.

Students may be asked to show their campus pass at any time and at any location on campus and will be expected to comply.

b)   Non-compliance Outcomes

Any student who does not complete a daily health screening before arriving on campus will not receive a campus pass and will not have access to campus spaces and services for that day.

Any student falsely reporting information on their daily symptom screener may be subject to discipline through the Office of Student Rights and Responsibilities (OSRR).

Any student whose campus pass is blue as a result of required ongoing testing non-compliance must complete a saliva test on campus or upload a negative test result in order to shift to a green pass.

Any student refusing to share their campus pass with a campus employee will not be

allowed to access campus spaces and services and may be subject to progressive discipline per OSRR student conduct policy.

**V.  TESTING**

a)  Compliance Expectations

With the exception of students who have attested that they are excluded because they have no intent to access the campus or in-person University programs, all currently enrolled students who are unvaccinated (including those who have submitted medical and religious exemptions), partially vaccinated, planning to vaccinate, in the process of vaccinating, or have not completed their COVID-19 Student Vaccination Status Reporting Form are required to comply with all University mandatory ongoing testing requirements during the COVID-19 pandemic. Ongoing testing refers to COVID-19 testing of asymptomatic unvaccinated or partially vaccinated students conducted at a frequency of every three days as determined by Campus Health and Wellbeing. Testing frequency may be changed from every 3 days based upon public health conditions as advised by Campus Health and Wellbeing

Ongoing testing is required for any unvaccinated or partially vaccinated student who meets *one or more* of the following criteria:
- Resides in University Housing
- Is enrolled in face-to-face courses
- Works on campus
- Participates in research on campus
- Attends an intercollegiate athletic event
- Participates in any University events or programs, regardless of location
- Uses any on-campus site or service (such as the Library, Rec Center, Campus Dining)

Ongoing testing is required for any student who has not submitted the required COVID-19 Student Vaccination Status Reporting Form.

*On-Campus Testing*. The University is committed to the health and wellbeing of the entire campus community and therefore has designated testing sites for both asymptomatic and symptomatic students.

i)Asymptomatic Testing. On-campus testing is located at UU 220 and is for <u>asymptomatic</u> students who are required to complete ongoing testing at the mandated frequency. Those asymptomatic students instructed by the University or county public health to get tested because of an exposure, regardless of vaccination status, also should report to one of these saliva testing sites at days 3-5 and 7-10 following the exposure notification.

ii)Symptomatic Testing. Any student, regardless of vaccination status, who exhibits <u>symptoms of COVID-19</u>, who has a red campus pass, or who has an isolation or quarantine status should report to Campus Health and Wellbeing or another healthcare provider for diagnostic testing.

*Off-Campus Testing*. Students who wish to comply with the University's requirement for ongoing testing via a service other than an asymptomatic campus testing site may do so. Only molecular COVID-19 tests are accepted for compliance with this policy (not antigen or antibody tests). Students who get tested through their own medical provider, either in response to the ongoing testing requirement or following an exposure, must upload test results through the COVID-19 Info tab on the portal for medical review. It is the student's responsibility to provide evidence of a negative test if they opt not to use asymptomatic campus testing.

*Temporary Release from Testing Requirement*. Some students who are required to engage in ongoing testing may be eligible for a temporary release from the ongoing testing requirement. Note: non-academic trips or extended out-of-town stays are not acceptable reasons for temporary release from the ongoing testing program.

Requests for temporary release will be considered only for the following:

iii) Medical Condition. A student with a documented condition that makes participating in testing not possible or contrary to medical recommendations must submit documentation to the Disability Resource Center for testing exemption consideration.

iv) Positive COVID-19 Test. A student who has tested positive for the Coronavirus within the last 90 days may be eligible for a temporary testing exemption.

v) Extenuating Circumstance. A student may be granted an exemption from ongoing testing for one of the below reasons:
- **Medical and/or Psychological Emergency:**
  In the event of a medical and/or psychological emergency that may result in, but is not limited to, hospitalization. Documentation by an appropriate medical professional confirming medical/psychological reasons may be required.

- **Unforeseen Personal Hardship:**
  In the case of a personal emergency that may interfere with a students' ability to test. Documentation may be required.

- **Military Service Obligation:**
  In the event a student is called to active duty or training in the United States Armed Forces, including service in the National Guard or Reserve. Verification is required.

*Case Reporting.* Any student who tests positive for COVID-19 or becomes aware that they may have been in close contact with someone who either has tested positive for or is suspected to have COVID-19 must report the positive result or exposure using the daily symptom screener.

*Isolation and Quarantine.* All students must comply with any directive from a University or health official requiring them to isolate and/or quarantine or quarantine in place. Students with COVID-19 must not knowingly expose others to the virus; this is a crime under CA health and safety code.

b)      Non-compliance Outcomes

All currently enrolled unvaccinated or partially vaccinated students (unless excluded due to attesting to no intent to access campus or University events or programs), as well as students who have not completed a Student Vaccination Status Reporting Form, are required to comply with all University mandatory ongoing testing requirements during the COVID-19 pandemic.

Failure to comply with ongoing COVID-19 testing will result in a student's loss of access to campus spaces and services via the following:

i) Campus Pass. On the first day on campus, non-compliant students will be assigned a blue campus pass and will not be able to access campus spaces and services including in-person classes, recreation center, library, campus dining, and all other student services until they upload pre-arrival COVID-19 test results (for a test taken within the preceding 72 hours). The blue campus pass will shift to another color once a student completes a COVID-19 test at a university testing site or submits and obtains university approval of test results from an external testing site.

ii) SSO Restrictions. Beginning October 04, 2021, students who are non-compliant with this ongoing testing policy will be subject to loss of access to Cal Poly technology services through single sign-on portal restrictions, including the applications listed below.

- E-mail
- Canvas (in-person and virtual classes)
- Zoom
- PeopleSoft Student Center (including DegreePlanner & ScheduleBuilder)
- O365/E-Mail/Calendar/OneDrive
- Virtual Labs
- Library Services (Online Resources)
- StudentPay/Timesheets
- Adding funds to PolyCard
- Follett
- National Student Clearinghouse (Transcripts)
- Adobe Creative Cloud
- Adobe Sign

Single sign on access will be restored once a student completes a COVID-19 test at a university testing site or uploads test results from an external testing site.

Students who lose SSO access for four consecutive days will receive email notification of a scheduled mandatory ongoing testing compliance meeting that will be held virtually.  During this meeting, the student will have an opportunity to provide justification for their non-compliance to the Temporary Release from Ongoing Testing Committee. Students who do not attend the meeting will continue to be restricted from SSO and will be referred to the Office of Student Rights and Responsibilities (OSRR) where disciplinary outcomes could result.

## VI.   AUTHORITY

California Department of Public Health. (2020). *COVID-19 Industry Guidance: Institutions of HigherEducation* (August 7, 2020).

California Department of Public Health. (2020). *Guidance for the Use of Face Coverings* (Revised June29, 202
0).

California Code of Regulations, Title 5, Section 41301. Standards of Student Conduct

California State University, Executive Order 1039 (November 17, 2008)

Standing Orders of the Board of Trustees of the California State University

**Approved by:**

Jeffrey D. Armstrong
President

**DATED:** October 14, 2021

# Exhibit 3

The Wayback Machine - https://web.archive.org/web/20211008033000/https://osrr.calpoly.edu/co...

 **CAL POLY**


MENU


MAPS


SEARCH

## Office of Student Rights & Responsibilities

## *COVID-19*



Faculty Resource: Guidance for COVID-19

**ATTENTION**: It is critical for the continued health and safety of our campus community that everyone follows all current COVID-19 related protocols and public health guidelines. All students are expected to comply with the protocols set forth by the university. Failure to follow the campus protocols will result in student conduct action.

Profile Image

San Luis Obispo County has set forth a series of actions to combat the novel COVID-19. The most up to date information regarding SLO County's response to the virus can be found at www.readyslo.org. We encourage our students to also refer to Cal Poly's information regarding the virus found here.

All members of the Cal Poly and San Luis Obispo community are encouraged to regularly check https://coronavirus.calpoly.edu/ for the latest information regarding the university's response and procedures for maintaining a safe and healthy environment.



## Academic Integrity

As students, faculty, and staff make a return to campus, classes may be offered in various modalities such as in-person or virtual. Regardless of the modality of instruction, students are expected to maintain their academic integrity when completing assignments or exams. All suspected and reported cheating/plagiarism cases will be taken seriously and investigated by OSRR.

Academic Integrity FAQ for Students - Answers to common questions regarding alleged cheating and plagiarism.

## *Frequently Asked Questions (Faculty & COVID-19)*

### What are the expectations for students to adhere to COVID-19 protocols while attending in-person classes?  ⌃

All students and employees are expected (unless exempt) to adhere to university safety protocols when attending in-person classes or otherwise on campus. If a student is not wearing a mask or otherwise refuses to wear their face covering properly, please make every effort to resolve the issue amicably and de-escalate the discussion while reminding the student of CSU and campus policies (including language in your class syllabus) that clearly describe the acceptable wearing of face coverings. If students do not have a face covering, invite them to seek a campus sanitation station where face coverings will be provided at no charge.

### What is Campus Pass?  ⌃

Campus Pass is a tool to ensure students are compliant with self-screening requirements. If a student fails to produce a green pass due to not completing their self-screening, inform the student that they will have to comply with self-screening requirements to participate in class.

### What does each Campus Pass color mean?  ⌃

The COVID-19 Self-Screening webpage provides detailed information on the campus pass system, but here is a snapshot of the meaning of each campus pass color: GREEN – Cleared to access all campus spaces and services. BLUE – Allowed only to access testing, health and safety sites. YELLOW – Allowed only to access testing, health and safety sites,

and grab-and-go dining sites. RED – Not cleared to enter campus other than health and safety sites. NO PASS – Not cleared to enter campus other than health and safety sites.

### What if a student refuses to comply with COVID-19 safety protocols?                    ⌃

Ask the student to leave class until they are prepared to follow the campus policy. Again, remind them of where they can get a face covering if they do not have one and/or point to syllabus language that clearly describes the acceptable wearing of face coverings. If you have asked a student to leave the class due to non-compliance, remind them that their absence will be recorded and could impact their grade per the attendance policy for the class. If a student(s) escalates the situation, causing a disruption to the class and refuses to leave, notify CPPD using the non-emergency line (805-756-2281). This should be done only when the situation has escalated to a point of willful, material, and substantial disruption to the class. If necessary, give the other students in the class a 10–15-minute break or dismiss the class for the day as you try to resolve the issue. If a disruption to the class occurs or if a student(s) is continually non-compliant—refuses to wear a face covering—notify the Office of Student Rights & Responsibilities using the public reporting form (https://osrr.calpoly.edu/report)

### Where can I submit a report to OSRR if a student does not comply with COVID-19   ⌃
### protocols?

Faculty and staff are encouraged to submit a report of student non-compliance to OSRR via our public reporting form, which can be found at https://osrr.calpoly.edu/report

### What happens after a report is submitted to OSRR?                                       ⌃

Once an allegation has been received, OSRR will determine specific next steps relative to the information provided by the incident report. OSRR will also provide several opportunities to comply with all COVID-19 safety protocols after an incident report has been received

### What about students with exemptions?                                                    ⌃

An instructor should not decide whether a student may qualify for an exemption from wearing a face covering. Cal Poly has a process in place to make these determinations and to notify instructors accordingly. Students with medically-related exemption requests should be directed to Tina Hadaway-Mellis, Assistant Vice President for Student Affairs, Health and Wellbeing. Students with religiously-related exemption requests should be directed to the Office of the Vice President for Student Affairs. Instructors cannot ask about or discuss a student's vaccination status or request proof of vaccination. Some students will have a medical or religious exemption from vaccination requirements.

# *Frequently Asked Questions*

### Can I (or my student) be held accountable under the Student Code of Conduct for not following COVID-19 protocols and guidelines?   ^

Yes. It is critical for the health and safety of our campus community that everyone follows all COVID-19 related protocols. Failure to follow the campus protocols will result in student conduct action, which could include suspension or expulsion. Additionally, students living on campus may face additional student conduct action, which could ultimately include removal from University Housing.

### Can I be held accountable under the Student Code of Conduct for breaking my isolation or quarantine requirement?   ^

Yes. Students who have tested positive for COVID-19 (or come in contact with an individual who tested positive for COVID-19) and fail to adhere to SLO County Public Health and CDC guidelines for isolation and quarantine may be subject to suspension or expulsion from the university.

### What is the difference between quarantine and isolation?   ^

*Isolation* separates people who are infected with the virus from people who are not infected. People who are in isolation should stay home until cleared by a medical professional. In the home, anyone sick or infected should separate themselves from others by staying in a specific "sick room" or area and using a separate bathroom (if available). *Quarantine* keeps someone who might have been exposed to the virus away from others. People in quarantine should stay home, separate themselves from others, monitor their health, and follow directions from their state or local health department.

### If I'm traveling from out of state, should I wait to get tested when I arrive in San Luis Obispo?   ^

If at all possible, get tested in your local area prior to moving. Please be sure to verify the average turnaround time for receiving test results, as laboratory processing and reporting times vary greatly. **Students preparing to move in to University Housing will be *required* to submit a negative COVID-19 test result taken within 72 hours (3 days) of arrival to campus, regardless of whether or not they have symptoms of COVID-19.** In addition, students living off campus in the San Luis Obispo community and at their permanent residences are strongly encouraged to test for COVID-19 before the first day of in-person classes on Sept. 20. Submitting proof of a negative test is not required upon start of fall term for on-campus instruction. San Luis Obispo County has several testing sites and urgent care facilities offering testing. Please see this list of testing sites in San

Luis Obispo County. On-campus residents may utilize the Health Center for COVID-19 testing. Please see the following Centers for Disease Control and Prevention recommendations on travel here.

| Is there a cost to getting a test? | ^ |
|---|---|

The test is free if you choose to use one of the testing locations in San Luis Obispo County. On-campus residents may utilize the Health Center for COVID-19 testing. You will not be charged a co-pay, but your insurance will be charged. If you don't have insurance, you won't be charged at all.

| Where can I get the latest information regarding Cal Poly's COVID-19 response? | ^ |
|---|---|

All members of the Cal Poly and San Luis Obispo community are encouraged to regularly check https://coronavirus.calpoly.edu/ for the latest information regarding the university's response and procedures for maintaining a safe and healthy environment.

## Additional information regarding Cheating and Plagiarism:

- Academic Senate Resolution 722-10 - Procedures for handling cases involving alleged cheating and plagiarism.
- Dear Cal Poly Student - A letter from our Director regarding allegations of cheating and plagiarism.
- Academic Integrity FAQ for Students - Answers to common questions regarding alleged cheating and plagiarism.



Our Info

Monday - Friday
8:00am - 5:00pm
Building 81, Hillcrest

osrr@calpoly.edu

Follow Us

Follow us on Instagram @calpolyosrr

Dean of Students

Dean of Students

Contact Us                Profile Link                DOS Website

CP Home | Directory | Campus Maps & Directions | University Store | Calendar | Employment | Campus Policies | Contact Us

COMPLAINT – 45
EXHIBIT 3

# EXHIBIT 4

**From:** covid-help@calpoly.edu
**Sent:** Friday, December 10, 2021 9:15 AM
**To:** Covid Help Center
**Subject:** Winter Ongoing Testing Compliance Program



# Ongoing Testing and Compliance Program

Dear Student,

You are receiving this email because Cal Poly's records currently show that you fall into one or more of the following categories:

· Unvaccinated

· Partially vaccinated (or in the process of becoming vaccinated)

· Planning to vaccinate but have not yet done so

· Do not plan to vaccinate and have claimed a medical or religious exemption

· Have not submitted a vaccination attestation.

For one of the above reasons, you have been entered into the Ongoing Testing Program and must comply with all university requirements explained below. This email contains important information—please read it carefully.

If you are now fully vaccinated (defined as being at least two weeks since your final dose) and you would like to update your attestation, please click here. If you would like more information about COVID-19 vaccines, including how to receive a vaccine on campus or locally, please click here. Until your attestation has been updated, you will be required to participate in the ongoing testing program.

**Ongoing Testing**

Students in the Ongoing COVID-19 Testing Program will be required to **test every three days throughout winter quarter, beginning prior to accessing in-person campus services, including attending class**.

- For example, if you test on Monday, you must test again

on Thursday, and then again on Sunday.

- - Testing is available at the free, on-campus testing site located at University Union 221 (the testing site moves from UU 220 on Dec. 16).

- - You may also test off-campus, but be aware that verification of off-campus test results may take longer and put you at risk for testing non-compliance outcomes such as a blue campus pass and/or Single Sign-On (SSO) restrictions.

Please note, if you plan to travel out of town over a weekend, especially a three-day weekend, you may consider testing sooner than your testing cycle dictates to remain compliant. To schedule an appointment, click here.

Ongoing COVID-19 testing is for students who do NOT have COVID-19 symptoms. If you do have symptoms (fever or chills, new or worsening cough, decrease in sense of smell or taste, nausea, vomiting, diarrhea, runny or stuffy nose, sore throat, muscle/body aches, fatigue or headache), contact Campus Health and Wellbeing at 805-756-1211 to schedule an appointment for a symptomatic test. Please do NOT visit an on-campus asymptomatic testing site.

**Daily Self-Screening and Campus Pass**

All currently enrolled students living on campus and off-campus students accessing campus for any reason (in-person classes, work, services, etc.) must complete a daily screening in order to obtain a campus pass, which is required to enter campus facilities. This includes fully vaccinated students and university employees who are enrolled academically.

You must complete your self-screening by noon (12 p.m.) or before going to campus, whichever comes first, to receive a campus pass. You can access the self-screening tool via your Cal Poly Portal, or receive a daily email or text message (opt in to receive these on the daily screening page in the portal) with a link to complete your daily self-screening.

Students must be prepared to show their pass upon entering a campus facility such as a classroom, building or office. Each pass will contain a date stamp, good for that day only.

For complete information on this requirement, including campus pass colors and what they allow you to access, visit the COVID-19 Self-Screening page.

**Compliance**

Important Dates and Reminders:

- -  The Ongoing COVID-19 testing program will begin on Monday, Jan. 3, 2022.

- -  The first two weeks will be devoted to awareness and education of the Ongoing Testing and Compliance Program.

- -  Active enforcement of testing compliance will begin on Tuesday, Jan. 18.

Complying with your ongoing testing schedule, as listed in the COVID-19 Info tab in your portal, is a factor that will be included in determining the color of your Campus Pass each day, along with completing the daily symptom screener. If it has been more than three days since your last asymptomatic COVID-19 test, you will NOT receive a green pass until you complete a COVID-19 test.

Similarly, staying current with your ongoing testing schedule is necessary to retain access to a variety of university resources and services through the Single Sign On (SSO) authentication system (i.e. my.calpoly portal). If it has been more than three days since your last COVID-19 test, you will lose access to several applications central to your ability to participate in campus programs and events such as email, Canvas, Zoom, the library, and other essential resources. There is no limit on the number of days a student can be in this status. You will retain access to the COVID-19 Info tab on the portal so you can schedule and complete a COVID test.

**SSO Restoration**

SSO access will be restored once you complete an ongoing test at an on-campus site (access restored within 60 minutes) or upload a negative test from an off-campus site. Check the COVID-19 Info tab in your

student portal to view your compliance status and resume the ongoing testing schedule.

**Temporary Release from Ongoing Testing**

Some students who are required to engage in ongoing testing may be eligible for a temporary release from the ongoing testing requirement.

For additional information about a temporary release from ongoing testing refer to the website.

**Communications**

Students in the Ongoing Testing Program are obligated to read all communications and stay on top of their testing schedule. View the COVID-19 Info tab on your student portal to view your current testing and warning dates, upload off-campus test results, and access other helpful resources.

Thank you again for your willingness to take this important step to keep yourself and everyone else safe!

Sincerely,

Tina Hadaway-Mellis, Assistant Vice President for Student Affairs Health & Wellbeing

Valla Hardy, Lead Coordinator for Isolation, Quarantine, and Compliance Support

1 Grand Ave., San Luis Obispo, CA 93407 | www.calpoly.edu

© 2020 Cal Poly | Privacy Notice

# EXHIBIT 5

**From:** Amy Ann Gode
**Sent:** Monday, January 3, 2022 12:14 PM
**To:** Elijah J. Behringer
**Subject:** Accommodation Update: You are Required to Wear a Mask in Classes
**Importance:** High

Hello Elijah,

We just tried to reach out by phone but there's no answer and no voicemail.  I realize this is hard to hear but we have reviewed your application and documentation and **it doesn't rise to the level of being reasonable**, under disability law, to allow you to not wear a face mask.  Tina Polito will be reaching out to you with more information.  In the meantime, you will be expected to wear a face mask.

Please call our front desk to set-up a time to discuss further with Tina if you'd like to.

Sincerely,
Amy

**Amy Gode**
**pronouns She/Her/Hers**
Assistant Director
Disability Resource Center

Cal Poly, San Luis Obispo, CA 93407-0200

**direct 805-756-1399**
**office  805-756-1395**
**www.drc.calpoly.edu**



# Exhibit 6

Elijah Behringer

Help

Go To _____ ⌄ »

**Account Inquiry** | Account Services

Summary | Activity | Charges Due | **Payments Credits**

Payment & Credit History   ⓘ We have encountered problems calculating your tuition.  Your account may not reflect the most recent charges.

From 10/01/2018 🗓 To 04/01/2023 🗓 [ go ]

| **Posted Payments & Credits** | Personalize | Find | View 5 | 🗗 | First ◄ 1-49 of 49 ► Last |

| Date | Payments & Credits | Amount |
|------|--------------------|--------|
| 05/02/2022 | 90000000 Payment - Thank You | 25.19 |
| 12/27/2021 | 83002025 Middle Class Schol | 25.00 |
| 03/23/2021 | 90000000 Payment - Thank You | 1,108.00 |
| 03/22/2021 | 83002025 Middle Class Schol | 766.00 |
| 03/22/2021 | 86800001 U Fed Sub Dir Ln-1 | 1,485.00 |
| 12/30/2020 | 90000000 Payment - Thank You | 1,106.00 |
| 12/28/2020 | 83002025 Middle Class Schol | 766.00 |
| 12/28/2020 | 86800001 U Fed Sub Dir Ln-1 | 1,485.00 |
| 09/09/2020 | 90000000 Payment - Thank You | 1,108.00 |
| 09/07/2020 | 83002025 Middle Class Schol | 766.00 |
| 09/07/2020 | 86800001 U Fed Sub Dir Ln-1 | 1,485.00 |
| 04/27/2020 | 64060604 Adj Dining Spring | 1,386.00 |
| 04/27/2020 | 64060304 Adj Spring Res Hall | 2,523.00 |
| 03/27/2020 | 90000000 Payment - Thank You | 997.00 |
| 03/23/2020 | 83002025 Middle Class Schol | 766.00 |
| 03/23/2020 | 89002011 Outside SchlrshpDisb1 | 250.00 |
| 03/23/2020 | 86800001 U Fed Sub Dir Ln-1 | 644.00 |
| 03/23/2020 | 86802001 U Fed Unsub Dir Ln-1 | 659.00 |
| 03/02/2020 | 90460008 Pymt Dining | 577.00 |
| 03/02/2020 | 90400500 Pymt Housing | 841.00 |
| 02/03/2020 | 90400500 Pymt Housing | 927.00 |
| 02/03/2020 | 90460008 Pymt Dining | 577.00 |
| 01/02/2020 | 90460008 Pymt Dining | 500.00 |
| 01/02/2020 | 90400500 Pymt Housing | 927.00 |
| 01/02/2020 | 90000000 Payment - Thank You | 1,160.00 |
| 12/30/2019 | 86802001 U Fed Unsub Dir Ln-1 | 660.00 |
| 12/30/2019 | 83002025 Middle Class Schol | 766.00 |
| 12/30/2019 | 89002011 Outside SchlrshpDisb1 | 250.00 |
| 12/30/2019 | 86800001 U Fed Sub Dir Ln-1 | 478.00 |
| 12/10/2019 | 64060604 Adj Dining Spring | 1,962.00 |
| 12/10/2019 | 64060602 Adj Dining Winter | 1,962.00 |
| 12/02/2019 | 90460008 Pymt Dining | 654.00 |
| 12/02/2019 | 90400500 Pymt Housing | 927.00 |
| 10/31/2019 | 90460008 Pymt Dining | 654.00 |
| 10/31/2019 | 90400500 Pymt Housing | 986.00 |
| 10/31/2019 | 89002012 Outside SchlrshpDisb2 | 500.00 |
| 10/04/2019 | 90460008 Pymt Dining | 21.00 |
| 10/01/2019 | 90460008 Pymt Dining | 308.00 |
| 09/30/2019 | 89002010 Outside SchlrshpDisb0 | 1,000.00 |
| 09/25/2019 | 90000000 Payment - Thank You | 1,644.00 |
| 09/19/2019 | 90000000 Payment - Thank You | 1,081.00 |
| 09/16/2019 | 90000000 Payment - Thank You | 493.00 |
| 09/12/2019 | 83002025 Middle Class Schol | 766.00 |
| 09/12/2019 | 86800001 U Fed Sub Dir Ln-1 | 809.00 |
| 09/12/2019 | 86802001 U Fed Unsub Dir Ln-1 | 660.00 |
| 09/09/2019 | 90400500 Pymt Housing | 493.00 |
| 05/08/2019 | 90400000 Pymt Housing Initial | 500.00 |
| 05/08/2019 | 90460000 Pymt Dining Initial | 1,000.00 |
| | **Total Posted Payment** | **41,433.19** |

COMPLAINT – 54
EXHIBIT 6