Elijah Behringer
behringerlaw@pm.me
PO Box 2973
Crestline, CA 92325
(909) 222-5370

# IN THE UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Elijah Behringer**, | **Case No.** 5:23-cv-00934-JFW(SK) |
| Plaintiff, | **OBJECTIONS TO REPORT AND RECOMMENDATION** |
| v. | |
| **California Polytechnic State University**, et al., | |
| Defendants. | |

**Introduction**

Here is a question you may be considering:

"Every case with a similar factual background (relating to COVID mandates) and due process has failed to surpass the motion to dismiss stage. Why on Earth should yours prevail?"

Here is the answer: I am raising an issue of law that those cases did not address. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 170 (2004). "Cases

are 'not precedential for propositions not considered… if a prior case does not raise or consider the implications of a legal argument, it does not constrain our analysis.'" <u>Alonso-Juarez v. Garland</u>, No. 15-72821, 2023 WL 5811043, at *12 (9th Cir. Sept. 8, 2023).

Here are a couple examples where factually similar "precedent" is not binding:

> "Respondent suggests that *Brewer* implicitly held that the right to counsel attached to the factually related murder when the suspect was arraigned on the abduction charge…. The Court′s opinion, however, simply did not address the significance of the fact that the suspect had been arraigned only on the abduction charge, nor did the parties in any way argue this question. **Constitutional rights are not defined by inferences from opinions which did not address the question at issue**." <u>Texas v. Cobb</u>, 532 U.S. 162, 169 (2001) (emphasis added).

> "[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." <u>Hagans v. Lavine</u>, 415 U.S. 528, 533 (1974)

In the adversary system of American law, "[a]n argument not properly argued or explained is waived." <u>Pfaendler v. Town of Sahuarita</u>, No. CV-20-00188-TUC-JCH, 2023 WL 2072498, at *6 (D. Ariz. Feb. 17, 2023). To the best of my knowledge, there is no factually similar case that has ruled yet on this particular question of law. Although this issue has already been raised and glossed over in my complaint and opposition briefs to the Defendants' motions to dismiss, I will now expound upon this matter and give it greater dimension.

**Declaration of Facts**

1. I, Plaintiff Elijah Behringer, declare that all allegations and material from the Plaintiff's complaint are supplemental to this brief of objections; and

2. This brief of objections responds directly to Magistrate Judge Steve Kim's report and recommendation to grant the pending motions to dismiss in favor of the Defendants.

**Factually Similar Cases**

It is no secret that courts have been rejecting cases like this one on a massive scale at the motion to dismiss stage. "In granting Defendants' motion to dismiss, this Court joins a growing list of courts in this state that have dismissed substantially identical claims challenging the same state COVID-19 Orders." BK Salons, LLC v. Newsom, No. 221CV00370JAMJDP, 2021 WL 3418724, at *1 (E.D. Cal. Aug. 5, 2021).

As opposing counsel state in support of their motion to dismiss: "Courts have decided that similar COVID protocols to the one challenged here do not violate any constitutional rights or state or federal laws. See, e.g., Kheriaty v. Regents of the Univ. of California, No. 22-55001, 2022 WL 17175070 (9th Cir. Nov. 23, 2022); Schmidt v. City of Pasadena, No. LA CV21-08769, 2023 WL 4291440 (C.D. Cal. Mar. 8, 2023)" (University Defendants' memorandum supporting the motion to dismiss, pg. 1).

And as Steve says in his report and recommendation (R&R), "neither masking indoors nor testing before entering a public space are "constitutionally problematic" requirements. Klaassen v. Trs. of Ind. Univ., 7 F.4th 592, 593 (7th Cir. 2021); see Guilfoyle v. Beutner, 2021 WL 4594780, at *16–17 (C.D. Cal. Sept. 14, 2021) (no fundamental right to not wear masks or not be screened); Health Freedom Def. Fund, Inc. v. City of Hailey, 590 F. Supp. 3d 1253, 1266 (D. Idaho 2022) ("[M]ask-mandates are not a form of medical treatment that triggers a fundamental liberty interest")" (pg. 7 of the recommendation and report). As covered above, however, prior cases are not binding for issues of law that weren't raised in those cases.

**Motion to Dismiss Standards**

To the best of my knowledge, there is no factually similar case that has ruled yet on the particular question of law that I will cover in greater detail in this brief. That would mean the question of law that I raise is a novel legal theory under this set of facts.

On a motion to dismiss, even prior cases that are factually similar are irrelevant when concerning a new question of law that is raised. "To the extent Plaintiffs' claims do 'not fall within the four corners of our prior case law,' this 'does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" Wright v. North Carolina, 787 F.3d 256, 263 (4th Cir. 2015) (citing McGary v. City of Portland, 386 F.3d 1259, 1270 (9th Cir.2004)). "The court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp., 764 F.2d 619, 623 (9th Cir.1985).

When opposing a motion to dismiss, the Plaintiff's burden is incredibly low. "Under the [Federal] Rules a plaintiff can plead the right legal theory, the wrong legal theory or **even no legal theory at all… without impacting on the complaint's sufficiency**." Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd., 933 F. Supp. 1381, 1384 (N.D. Ill. 1996) (emphasis added). "In ruling on motion to dismiss for failure to state claim upon which relief can be granted, legal test to be applied is not whether all of relief asked for by plaintiffs could possibly be granted but **whether under any state of facts which might be established at a trial in support of claim they could be accorded any relief** (emphasis added)." Sch. Dist. of Kansas City, Mo. v. State of Mo., 460 F. Supp. 421, 429 (W.D. Mo. 1978). "For purposes of evaluating a motion to dismiss, the court 'must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party.'" Tucker v. Apple Computer, Inc., 493 F. Supp. 2d 1090, 1095 (N.D.

Cal. 2006). A motion to dismiss complaint for failure to state a claim "allows of no discretion in the usual sense. The complaint is either good or not good." Mitchell v. E-Z Way Towers, Inc., 269 F.2d 126, 130 (5th Cir. 1959).

**Immunity**

Even though this question of law has not been ruled on yet in cases *that have similar facts*, questions of immunity do not pose a threat to this complaint when ruling on this motion. "An official sued in his personal [individual] capacity, although deprived of eleventh amendment immunity, may assert a defense of qualified immunity." Pena v. Gardner, 976 F.2d 469, 473 (9th Cir. 1992), as amended (Oct. 9, 1992). "'[D]ismissal of a § 1983 suit under Rule 12(b)(6) is a delicate matter that district courts should approach carefully…' Qualified immunity is 'almost always a bad ground for dismissal' and is more appropriately addressed on a motion for summary judgment." Manos v. Caira, 162 F. Supp. 2d 979, 995 (N.D. Ill. 2001). "A defense of qualified immunity cannot ordinarily support dismissal under Fed.R.Civ.P. 12(b)(6)." Liffiton v. Keuker, 850 F.2d 73, 76 (2d Cir. 1988).

When testing qualified immunity, the "reasonableness of official action… must be "assessed in light of the legal rules that were clearly established at the time [the action] was taken." Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017). "Clearly established rights are not limited to federal laws but **may also be found in state statutes**. *Sabia v. Neville,* 165 Vt. 515, 522, 687 A.2d 469, 474 (1996). **There is no need for a case on point**, but existing precedent must have placed the statutory or constitutional question **beyond debate**" to defeat qualified immunity. Nelson v. Town of Johnsbury Selectboard, 115 A.3d 423, 441 (Vt. 2015) (emphasis added).

"[T]he reasonableness of the official's conduct is **not measured against the official's *actual* knowledge of constitutional standards** and the probable constitutionality of his or her action, but rather against a relatively uniform level of 'presumptive knowledge' of constitutional standards." Emery v. Holmes, 824 F.2d 143,

147 (1st Cir. 1987) (emphasis added). "A constitutional right is clearly established if 'in **light of pre-existing law the unlawfulness [of the alleged conduct is] apparent**.' *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). This is true **even if the "very action in question" had not then been held to be a constitutional violation**." Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995) (emphasis added).

"[S]ubjective intent is not relevant to the reasonableness prong of the qualified immunity test because that factor is governed by an objective test." Sweaney v. Ada Cnty., Idaho, 119 F.3d 1385, 1393 (9th Cir. 1997). "[O]nly officials performing discretionary, as opposed to ministerial [mandatory], functions, are entitled to qualified immunity." Perez v. Oakland Cnty., 466 F.3d 416, 429 (6th Cir. 2006). "[T]he principle that an agent is liable for his own torts 'is an ancient one and applies even to certain acts of public officers or public instrumentalities.'" Larson v. Dom. & For. Com. Corp., 337 U.S. 682, 687 (1949).

The facts of the complaint are sufficient to defeat the motion to dismiss. As a matter of law, the Defendants' motions cannot stand. How? To answer that question, we delve into the context of written constitutions.

**The Purpose of Constitutions**

"The people of the United States erected their Constitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty; and to protect their persons and property from violence." Calder v. Bull, 3 U.S. 386, 388 (1798). "[T]he limitations imposed by our constitutional law upon the action of the governments, both state and national, are essential to the preservation of public and private rights." Hurtado v. People of State of Cal., 110 U.S. 516, 536 (1884).

"The idea of the Constitution 'was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.'" Obergefell

v. Hodges, 576 U.S. 644, 677 (2015). A "constitution stands above legislative and judge-made law, and the rights contained therein speak 'for the entire people as their supreme law.' *Davis v. Burke,* 179 U.S. 399, 403 (1900)." In re Town Hwy. No. 20, 45 A.3d 54, 64 (Vt. 2012). "Unlike ordinary legislation, a constitution is enacted by the people themselves in their sovereign capacity and is therefore the paramount law." State ex rel. Workman v. Carmichael, 819 S.E.2d 251, 263 (W. Va. 2018). A state constitution "reflects the will of the people, who hold the ultimate political power in the state." United Auto Workers, Loc. Union 1112 v. Brunner, 911 N.E.2d 327, 332 (Ohio App. 10th Dist. 2009).

Likewise, "the California Constitution is the paramount authority to which even sovereignty of the state and its agencies must yield." City and Cnty. of San Francisco v. Regents of U. of California, 442 P.3d 671, 684 (Cal. 2019). "[A]ll branches of [California] government are required to comply with constitutional directives…. [e]very constitutional provision is self-executing to this extent, that everything done in violation of it is void." Katzberg v. Regents of U. of California, 58 P.3d 339, 342 (Cal. 2002).

Moreover, it is especially worth noting that no emergency can suspend or modify constitutional provisions. "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency." In re Kazas, 70 P.2d 962, 965 (Cal. App. 4th Dist. 1937). "Emergencies do not create power…. There is no express or implied exception in this constitutional provision." Kirkpatrick v. Stelling, 98 P.2d 566, 573 (Cal. App. 1st Dist. 1940).

"The worst of precedents may be established from the best of motives." U.S. v. Bollman, 24 F. Cas. 1189, 1192 (C.C.D.D.C. 1807). The tendency of courts to permit "zeal for the public interest… to overstep the bounds of the law and the constitution" is well-known. Ibid.

> "The constitution was made for times of commotion. In the calm of peace and prosperity there is seldom great injustice. Dangerous precedents occur in dangerous times. It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude…. In cases of emergency it is for the executive department of the government to act upon its own responsibility, and to rely upon the necessity of the case for its justification; but this court is bound by the law and the constitution in all events." Ibid.

So, it is clear that constitutional provisions are not suspended during emergencies, including alleged COVID-19 pandemic emergencies or any other purported public health emergencies. While government officials may "enact such measures as will protect all persons from the impending calamity of a pestilence…That [public health] powers would be conferred without regulating or controlling their exercise is not to be supposed." Jew Ho v. Williamson, 103 F. 10, 20 (C.C.N.D. Cal. 1900). Although there is much disagreement among the public over whether the global COVID-19 response was due to a real pandemic emergency or to something else altogether, we may save any factual disputes for a different day. On a motion to dismiss, the law is all that matters. Emergency or no, all constitutional provisions are always in full effect and are binding upon all branches of government.

**Defining Liberty and Property Interests**

We now turn to the question of due process. As Steve says in his R&R (pg. 6): "In his first federal count, plaintiff alleges that defendants denied him 'procedural due process under the Fourteenth Amendment of the U.S. Constitution.' (FAC at 18). To state such a claim, plaintiff must allege facts showing '(1) a deprivation of a constitutionally protected liberty

or property interest, and (2) a denial of adequate procedural protections.' Kildare v. Saenz, 325 F.3d 1078, 1085 (9th Cir. 2003)." There is no dispute that the facts alleged in the complaint amount to a deprivation of liberty. What is at issue before this Court is whether that deprivation was *lawful.*

Further, the facts of this case also indicate a deprivation of a property interest from the Plaintiff. "Property interests… are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).

We now turn to state law to see if Elijah has a protected property interest in his continuous, uninterrupted enrollment at Cal Poly. California Education Code §66201 plainly states:

> It is the intent of the Legislature that each resident of California who has the capacity and motivation to benefit from higher education should have the opportunity to enroll in an institution of higher education. **Once enrolled, each individual should have the opportunity to continue as long and as far as his or her capacity and motivation,** as indicated by academic performance and commitment to educational advancement, will lead him or her to meet academic standards and institutional requirements [emphasis added].

As already discussed in the complaint, unconstitutional conditions or restrictions may not be imposed upon college attendance (or any other activity of life). The notion that there is "no fundamental right to a university education" is irrelevant here (see pg. 6 of the report and recommendation). "College attendance, **whether it be a right or a privilege**…. We do not hold that a school has the authority to require a student to discard any

constitutional right when he matriculates." <u>Esteban v. C. Missouri State College</u>, 415 F.2d 1077, 1089 (8th Cir. 1969) (emphasis added)."

California law agrees. "By the act of matriculation… a contract between the student and the institution is created containing two implied conditions: (1) that the student will not be arbitrarily expelled, and (2) that the student will submit himself to reasonable rules and regulations… [this contract], by its very nature, **incorporates constitutional principles of due process**." <u>Andersen v. Regents of U. of California</u>, 99 Cal. Rptr. 531, 535 (Cal. App. 1st Dist. 1972) (emphasis added).

So, it is clear that Elijah has a contractual property interest and liberty interest in continuous enrollment at a public university he is admitted to, especially so when he does not abuse his position at the university. Peles v. LaBounty, 153 Cal. Rptr. 571, 575 (Cal. App. 2d Dist. 1979).

But you may be tempted to protest, "What about the COVID-19 pandemic? Elijah wasn't completely banned from attending courses. The university gave him the option to attend. Elijah was suspended because he refused to follow the COVID mandates." That's correct. Yet, as we shall discuss further in specific detail, Elijah had a right to attend university free of COVID mandates.

It is well established under law that "[p]ersonal liberty is a fundamental right." <u>People v. Applin</u>, 46 Cal. Rptr. 2d 862, 864 (Cal. App. 5th Dist. 1995). Further, "[a] man may not be deprived of his liberty for the doing of an act which is not and cannot be made unlawful." <u>Ex parte Dees</u>, 189 P. 1050 (Cal. App. 1st Dist. 1920). "Though there is no constitutional right to free public education, state may not unequally condition access to public education on performance of an act that infringes on exercise of First Amendment [or any other] rights." <u>Rader v. Johnston</u>, 924 F. Supp. 1540 (D. Neb. 1996). "The liberty mentioned is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways." <u>Ex parte Drexel</u>, 82 P. 429, 430 (Cal. 1905).

There is no doubt that liberty is a constitutionally protected interest. Yet "the mere

deprivation by state action of a constitutionally protected interest is not in itself unconstitutional. What is unconstitutional is the deprivation of such an interest *without due process of law.* " <u>Wallace v. Tilley</u>, 41 F.3d 296, 299 (7th Cir. 1994). If public health measures are enacted *with* due process of law, all is good, and these measures may restrain liberty as needed to preserve the safety and welfare of the people.

**Defining Due Process**

This is the great question before this Court: where the COVID mandates enforced upon Elijah in accordance with due process of law? To answer this question, we must define what the fuzzy term "due process" means in the Fourteenth Amendment of the U.S. Constitution. When defining otherwise ambiguous constitutional provisions, "it is not inappropriate briefly to review the background and environment of the period in which that constitutional language was fashioned and adopted." <u>Everson v. Bd. of Ed. of Ewing Tp.</u>, 330 U.S. 1, 8 (1947). So, our definition for "due process" begins here:

> "[T]he notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words." *McDonald v. Chicago*, 561 U.S. 742, 811, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). Rather, **"'considerable historical evidence supports the position that "due process of law" was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law.'"** <u>United States v. Vaello Madero</u>, 142 S. Ct. 1539, 1545 (2022) (J. Thomas, concurring) (emphasis added).

Indeed, the "the pre-constitutional and Founding-era evidence regarding the meaning of 'due process of law' strongly suggests the phrase most likely would have been viewed in 1791... as guaranteeing either that duly enacted law would be followed or that certain requisite procedures would be observed." Ibid.

So, the U.S. Constitution's mandate in the Fourteenth Amendment that "No State shall… deprive any person of life, liberty, or property, without due process of law" means that a public official of a state may be liable for an act "not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." Taylor v. Westly, 402 F.3d 924, 933 (9th Cir. 2005). This is also known as acting *ultra vires*, or "beyond one's power."

It has already been established that Elijah had both a liberty and a property interest in his continued attendance at university with no COVID restrictions. Elijah already possessed these interests before he was deprived of them. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired…" Newman v. Sathyavaglswaran, 287 F.3d 786, 790 (9th Cir. 2002). So, the question remains, were the COVID restrictions within statutory and constitutional powers?

"If plaintiff could show that the legislation here was arbitrary or irrational, **or that the legislative process was defective**, she would have a triable issue of fact as to whether she had been denied due process." Rea v. Matteucci, 121 F.3d 483, 485 (9th Cir. 1997) (emphasis added). "California did not and could not authorize its officer to take people's property **without notice and in the absence of any [lawful] connection to the State of California**." Taylor v. Westly, 402 F.3d 924, 935 (9th Cir. 2005) (emphasis added). "[I]t goes without saying that the *most basic* [due process] violation possible involves the performance of **unauthorized** [medical] tests…. The tests at issue in this case **thus implicate rights** protected under both the Fourth Amendment and the Due Process Clause of the Fifth or Fourteenth Amendments." Norman-Bloodsaw v. Lawrence Berkeley Laboratory, 135 F.3d 1260, 1269 (9th Cir. 1998) (emphasis added).

Now, the meaning of "due process" in this case is well-defined. For the purposes of the Fourteenth Amendment, if it is clear that the COVID mandates that the university and county Defendants enforced upon Elijah were not based in legislation, or "unauthorized," or "in the absence of any [lawful] connection to the State of California," or "that the legislative process" behind the enforced measures "was defective," then Elijah has a "triable issue of fact" as to whether he had been denied due process in the context of the Fourteenth Amendment. In such a case, this Court would be compelled by law to deny the Defendants' motions to dismiss.

Even if the COVID measures enforced on Elijah were enacted by the legislature, there would still be a requirement that the legislative act agreed with the state and federal constitutions, if the act were to be valid.

> "[T]he [due process clause] is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave [the government] free to make any process 'due process of law,' by its mere will. To what principles, then, are we to resort to ascertain whether this process, enacted by [the government], is due process? To this the answer must be twofold. We **must examine the constitution itself, to see whether this process be in conflict with any of its provisions**. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country. Den ex dem. Murray v. Hoboken Land & Imp. Co., 59 U.S. 272, 276–77 (1855) (emphasis added).

**Interpreting Constitutional Provisions**

So, were the COVID mandates which were enforced upon Elijah valid regulations or legislation? To answer that question, we turn to specific provisions of the California Constitution. "It is axiomatic that 'in every case involving the application or interpretation of a constitutional provision, analysis must begin with the language of the constitutional provision itself.'" State ex rel. Workman v. Carmichael, 819 S.E.2d 251, 264 (W. Va. 2018). "[I]n arriving at the meaning of a Constitution, consideration must be given to the words employed, giving to every word, clause and sentence their ordinary meaning. If doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid." State Bd. of Ed. v. Levit, 343 P.2d 8, 20 (Cal. 1959).

Article IV, Section 8(b)(1) of the California Constitution states: "The Legislature may make no law except by statute and may enact no statute except by bill." Further, Article IV, Section 8(d) states: "Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill. In each house the section and the bill shall be passed separately, each by rollcall vote entered in the journal, two thirds of the membership concurring."

When reading this text of the California Constitution, take note that there is no power conferred upon the Governor, state agencies, or counties to make statutes, even "those that are necessary for immediate preservation of the public peace, health, or safety." Article IV, Section 3(b) states: "On extraordinary occasions the Governor by proclamation may cause the Legislature to assemble in special session. When so assembled it has power to legislate only on subjects specified in the proclamation but may provide for expenses and other matters incidental to the session." Indeed, even "on extraordinary occasions," these constitutional provisions do not contemplate delegation of legislative authority to the state governor or any agencies or officials which are under his purview.

It is true that public officials have quasi-legislative authority to create rules and regulations which help enforce the laws enacted by the legislature. But "[a]n

unconstitutional delegation of power occurs" when public officials are given "unrestricted authority to make fundamental policy determinations." Clean Air Constituency v. California State Air Resources Bd., 523 P.2d 617, 626 (Cal. 1974). "[A] governmental agency that acts outside of the scope of its statutory authority acts ultra vires and the act is void." California Dui Lawyers Assn. v. California Dept. of Motor Vehicles, 229 Cal. Rptr. 3d 787, 800 (Cal. App. 2d Dist. 2018).

So, what was the scope of authority that was conferred upon the Defendants when they enforced COVID-19 measures on Elijah? The scope of the authority conferred upon the Defendants has its origins in the California Emergency Services Act (California Government Code §8550 et seq.). The Governor may authorize emergency powers to be exercised by public officials, including the Defendants.

Yet by its express terms this Act states that "[n]one of the provisions of this chapter shall limit, modify, or abridge the powers vested in the Governor under the Constitution or statutes of the state." Cal. Govt. Code §8574. Indeed, this legislation, and all legislation, is to be interpreted in accordance with the state and federal constitutions. "If the statute is offensive to the Constitution it is 'no law at all'" and is beyond the legislative power. P. Indem. Co. v. Myers, 296 P. 1084, 1087 (Cal. 1931). If "a law or ordinance is beyond the legislative power," it is "to that extent void." Ex parte Dart, 155 P. 63, 67 (Cal. 1916).

Further, a legislative enactment that confers power upon public officials is "void for vagueness" if it "delegates basic policy matters to [public officials]" for "resolution on an *ad hoc* and subjective basis." People v. Lopez, 20 Cal. Rptr. 3d 801, 805 (Cal. App. 6th Dist. 2004).

Even if the California Emergency Services Act conferred discretion to public officials to make "basic policy matters" to protect vague and broad notions of health and safety, the Act would be void for vagueness. "A challenge to a statute based on vagueness grounds requires the Court to consider whether the statute is sufficiently clear so as not to cause persons 'of common intelligence… necessarily [to] guess at its meaning and [to]

differ as to its application.'" <u>Humanitarian L. Project v. Ashcroft</u>, 309 F. Supp. 2d 1185, 1198–99 (C.D. Cal. 2004).

What may be required to "protect the health and safety," as described in Cal. Govt. Code §8550, is certainly a topic that would "cause persons… to guess at" the meaning of the mystical notion of "protect[ing] the health and safety" and would create serious dispute "as to its application." So, any statute purporting to protect public health and safety must be specific, and public officials must follow the statute.

Public officials, including the Defendants, may not enforce orders or public health regulations that are not bound by any clear, unambiguous interpretation of a statute and are instead subjectively based in the California governor's or public health officals' vague notions of "protect[ing] the health and safety." Statutes that are not specific in scope are void for vagueness. Yet some statutes that appear ambiguous by themselves are actually not, because they need to be interpreted in context. "If a reasonable and practical construction of a statute can be given, the law will not be held void for uncertainty." <u>DeLisi v. Lam</u>, 252 Cal. Rptr. 3d 336 (Cal. App. 1st Dist. 2019).

So, there is no need to hold the California Emergency Services Act unconstitutional. This Act simply must be interpreted in the context of the California Constitution to define the specific scope of the Act. As mentioned before, the California Constitution makes it clear that "[t]he Legislature may make no law except by statute and may enact no statute except by bill." Cal. Const. Article IV, §8(b)(1). The California Constitution also makes it clear that even on "extraordinary occasions," all the governor is allowed to do is issue a "proclamation" that "may cause the Legislature to assemble in special session." Cal. Const. Article IV, §3(b). "If there is any doubt as to the Legislature's power to act in any given case…. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." <u>People v. Camba</u>, 57 Cal. Rptr. 2d 907, 911 (Cal. App. 1st Dist. 1996).

When a mode of procedure has been provided by the California Constitution, that

mode is mandatory, and is the total measure of power conferred. "The provisions of article I, section 28 [formerly s 22] relating to the mandatory and prohibitory nature of the provisions of the Constitution apply to all sections of the Constitution alike, and everyone subject to its mandate must comply." Taylor v. Madigan, 126 Cal. Rptr. 376, 381 (Cal. App. 1st Dist. 1975). "[Courts] must enforce the provisions of our Constitution and 'may not lightly disregard or blink at ... a clear constitutional mandate.'" People v. Super. Ct. (T.D.), 250 Cal. Rptr. 3d 661, 667 (Cal. App. 5th Dist. 2019), as modified on denial of reh'g (Sept. 3, 2019).

"To be valid, administrative action must be within the scope of authority conferred by the enabling statutes, and if the court determines that a challenged administrative action was not authorized by or is inconsistent with acts of the legislature, that action is void." Hamilton v. Gourley, 126 Cal. Rptr. 2d 652 (Cal. App. 3d Dist. 2002).

Since there is no procedure for state officials to create or enforce emergency law or emergency public health mandates without legislatively-enacted "enabling statutes" authorizing them to do so, the Defendants acted beyond their scope of authority in enforcing COVID mandates upon Elijah. A proper, constitutional application of the Emergency Services Act would be to allow the governor to take specific action *after* the legislature has created unambiguous "enabling statutes" declaring the specific conditions for the exercise of emergency power and the specific, unambiguous powers granted.

Neither the report nor opposing counsels' briefs point to any specific, unambiguous constitutional or statutory authority that proves that the COVID mandates which were enforced upon Elijah were within the scope of the law. They cannot because there are none. This would make the COVID mandates "null under law," meaning that they could be disregarded with "legal impunity" (see page 8 of the recommendation and report and page 19, footnote 42 of the amended complaint).

The constitutional requirement for formal legislation may sound inconvenient and inefficient in the context of a public health emergency that public officials might need to respond to immediately, but a "[c]onstitution does not exist to guarantee efficiency; it

exists to guarantee individual liberty." <u>Bradshaw v. Berryhill</u>, 372 F. Supp. 3d 349, 361–62 (E.D.N.C. 2019), <u>aff'd sub nom.</u> <u>Probst v. Saul</u>, 980 F.3d 1015 (4th Cir. 2020).

**The Duty of the Court**

Now that it is clear that the Defendants violated the California Constitution and laws when enforcing COVID-19 mandates to deprive Elijah of his liberty and property interests in his education without due process of law, we now determine if a federal court has jurisdiction over the matter.

Even though the "validity of [an] act has not been directly presented to or determined by the state court, but the first attack by the parties interested is made in the federal court and by this suit, and conflict with both Constitutions is alleged," it is undisputed that "[u]ndoubtedly a federal court has the jurisdiction, and… [it is] its duty to pass upon an alleged conflict between a statute and the state Constitution, even before the question has been considered by the state tribunals. All objections to the validity of the act, whether springing out of the state or of the federal Constitution, may be presented in a single suit, and call for consideration and determination." <u>San Francisco Gas & Elec. Co. v. City and Cnty. of San Francisco</u>, 189 F. 943, 947 (C.C.N.D. Cal. 1911).

"A federal court's duty, when faced with a constitutional challenge such as this one, is to employ traditional tools of statutory construction to determine the statute's [or COVID order's] 'allowable meaning.' In doing so, we look to the words of the statute itself as well as state court interpretations of the same or similar statutes." <u>California Teachers Ass'n v. State Bd. of Educ.</u>, 271 F.3d 1141, 1147 (9th Cir. 2001).

That work has already been done for this Court. There is no "allowable meaning" that makes enforcement of a COVID order upon Elijah (or anyone else for that matter) either constitutional or lawful. COVID-19 orders are inherently repugnant to the state and federal constitutions, as well as state and federal law, and any deprivation of liberty and property resulting from a COVID order—even temporarily—is a denial of due process of law.

**Civil Rights Violations**

It matters not that COVID orders may have been enforced on populations equally, or that Elijah was "no more particularly harmed" than others (see page 5 of the recommendation and report). That just makes the COVID-19 orders a civil rights violation of colossal proportions, a concept which, unfortunately, is not new to government. "The state regulates the use of a public highway by citizens of the United States solely upon the basis of race." Plessy v. Ferguson, 163 U.S. 537, 553 (1896) (mass racial discrimination), "Three generations of imbeciles are enough." Buck v. Bell, 274 U.S. 200, 207 (1927) (Justice Holmes, upholding a eugenics law). "In support of this blanket condemnation of all persons of Japanese descent, however, no reliable evidence is cited to show that such individuals were generally disloyal." Korematsu v. U.S., 323 U.S. 214, 236 (1944) (forced internment in concentration camps). "The [quarantine and vaccination] regulations they have adopted **appear to be without legislative authority**, but assuming that they have the sanction of a general authority under the resolution of May 18, 1900, still they cannot be sustained. They are not based upon any established distinction in the conditions that are supposed to attend this plague, or the persons exposed to its contagion… without regard to the previous condition, habits, exposure to disease, or residence of the individual." Wong Wai v. Williamson, 103 F. 1, 7 (C.C.N.D. Cal. 1900) (coerced vaccination of Asian people traveling from San Francisco) (emphasis added). Mass civil rights violations happen because egomania is contagious.

**Non-enforcement of Civil Rights Law**

In his report and recommendation, Steve asserts that Elijah does not have standing to sue since the COVID orders affected "the public at large" (see pg. 5 of the report). Although it is unclear what logic or legal theory this might be based on, it appears to be a perversion of equal protection clause jurisprudence. The "Equal Protection Clause guarantees that the Government will treat similarly situated individuals in a similar manner." U.S. v. Vaello Madero, 142 S. Ct. 1539, 1559 (2022) (J. Sotomayor, dissenting).

An obvious exception to this clause is when the government is committing a laundry list of crimes and constitutional violations.

"[A]n unlawful or unauthorized exercise of power does not become legitimated or authorized by reason of habitude." In re Benny, 29 B.R. 754, 762 (N.D. Cal. 1983). "The failure of the executive branch to enforce a law does not result in its modification or repeal." D.C. v. John R. Thompson Co., 346 U.S. 100, 113–14 (1953).

> "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration… [of the] law the end justifies the means-to declare that the government may commit crimes in order to… [govern] would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." Olmstead v. U.S., 277 U.S. 438, 485 (1928).

**Conceded Arguments**

As for Steve's assertions that Elijah had "no fundamental right" or "constitutionally protected liberty interest" in not being suspended from his university, it is unclear why he made these assertions *ipse dixit* and did not bother addressing or interpreting any of the constitutional provisions and statutes that were presented in the complaint and the opposition to the motions to dismiss, as well as this brief of objections (see pgs. 11-14 of

the amended complaint and pg. 13 of the opposition brief). Although he cited cases that had upheld other mandates as constitutional, none of those cases have addressed or ruled on the specific *ultra vires* due process issue I have repeatedly presented.

"A **federal court's duty**, when faced with a constitutional challenge such as this one, is to employ traditional tools of statutory construction to determine the statute's [or constitution's] 'allowable meaning.' In doing so, we look to the words of the statute itself as well as state court interpretations of the same or similar statutes." California Teachers Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1147 (9th Cir. 2001) (emphasis added).

Why Steve would abandon his duty to interpret the constitutional provisions at issue is unclear, especially when this is a case about fundamental constitutional rights. "It is emphatically the province and duty of the judicial department to say what the law is." Whole Woman's Health v. Jackson, 595 U.S. 30, 61–62 (2021). Without interpreting the provisions at issue, it is impossible to know what "fundamental rights" Elijah has in this case. "What provision of the Constitution could any judge rightly declare less than fundamental?" U.S. v. Vaello Madero, 142 S. Ct. 1539, 1555 (2022) (J. Gorsuch, concurring).

Of course, the work has already been done in this brief. From the complaint, the opposition to the motions, and now this objection brief: interpretations of the due process clause of the U.S. Constitution's Fourteenth Amendment and the California Constitution's Article IV, Sections 3(b), 8(b)(1), and 8(d); Article I, Section 26; and discussion of their relation to the COVID-19 orders are still waiting to be contested before this Court.

To date, opposing counsel has not addressed nor disputed the interpretation of the Fourteenth Amendment due process clause and the California Constitution that has been repeatedly presented in the complaint, the opposition to the motions, and now in this brief. If this interpretation is true, then the Defendants are liable for enforcing COVID order upon Elijah. "When a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded." AK v. Behavioral

Health Sys., Inc., 382 F. Supp. 3d 772 (M.D. Tenn. 2019). "In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011).

**Liability for Damages**

It follows then, that if the Defendants violated Elijah's rights and deprived him of his liberty and property interests, then they owe damages. "[E]very violation [of a right] imports damage." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 802 (2021) Although the compensatory damages outlined in the complaint are "retroactive" (pg. 36 of amended complaint and pg. 10 of report and recommendation), they are retroactive because enforcement of the COVID orders were also retroactive in their effect on Elijah's contractual engagement with his university. "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created." Kashmiri v. Regents of U. of California, 67 Cal. Rptr. 3d 635, 646 (Cal. App. 1st Dist. 2007).

Elijah matriculated in 2019, and he didn't pay and work at a four-year degree to get suspended indefinitely halfway through, especially when the unlawful COVID mandates that suspended him were still in effect for a long time after, depriving him of vital time that he could have spent completing his studies. Worse still, there was nowhere else to go. As Steve pointed out, COVID mandates were imposed on the "public at large." Now don't get me wrong, public health mandates are good, if they are based on law and evidence. Unfortunately, the years-long "emergency COVID response" was based on neither.

"[E]very statute [or COVID order], which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." Strauss v. Horton, 46 Cal. 4th 364, 471–72, 207 P.3d 48, 120 (2009).

1       Since Elijah's matriculation took place in 2019, and a "contract between the

2   student and the institution is created" by the "act of matriculation,"(see *Kashmiri,* 67

3   Cal. Rptr. 3d 635, 646*)* and the COVID orders "impose[d] a new [unlawful] obligation...

4   in respect to transactions or considerations already past," then Elijah's liberty and

5   property interests were damaged, and Elijah is entitled to a jury on the issue of the relief

6   requested in the complaint (pg. 36 of complaint).

7

8   **Recommendation**

9   I now will recommend what the Court should do on the motions to dismiss.

10       "[N]either a state nor its officials acting in their official capacities can be sued under

11   the Civil Rights Act, because they are not "persons" under section 1983. (*Will v. Michigan*

12   *Dept. of State Police, supra,* 491 U.S. at p. 71, 109 S.Ct. 2304.).... [S]ection 1983 actions can

13   only be brought against individuals." <u>California Correctional Peace Officers Assn. v.</u>

14   <u>Virga</u>, 103 Cal. Rptr. 3d 699, 707 (Cal. App. 1st Dist. 2010). "Our analysis of the

15   legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did*

16   intend municipalities and other local government units to be included among those

17   persons to whom § 1983 applies." <u>Monell v. Dept. of Soc. Services of City of New York</u>,

18   436 U.S. 658, 690 (1978). So, state defendants are immune only in their official capacities,

19   and county defendants are arguably not immune in any capacity. As for qualified immunity

20   issues, see pages 5 and 6 of this brief.

21       Also, there is no need to comply with state notice-of-claim statutes for this suit. A

22   state "notice-of-claim statute conflicts in both its purpose and effects with § 1983's

23   remedial objectives, and because its enforcement in state-court actions will frequently and

24   predictably produce different outcomes in § 1983 litigation based solely on whether the

25   claim is asserted in state or federal court, it is pre-empted pursuant to the Supremacy

26   Clause when the § 1983 action is brought in a state court." <u>Felder v. Casey</u>, 487 U.S. 131,

27   131 (1988).

28       So, the Fourteeth Amendment due process, 42 U.S.C. §1983, and 42 U.S.C.

§1985(3) claims should not be dismissed to the individual capacity of the Defendants but may be dismissed to all university Defendants in their official capacities. The county Defendants may be liable in their official capacities. Also, it cannot be emphasized enough that **the COVID mandate cases that the report and opposing counsel cite do not cover the issues of law raised in this case and do not control this case** (see the Introduction section on page 1, Interpreting Constitutional Provisions on page 14, and Conceded Arguments on page 20).

As for the RICO extortion claim: "It may well be proper under the Hobbs Act for the Government to charge a person who obtains money by threatening a third party." Sekhar v. United States, 570 U.S. 729, 734, 133 S. Ct. 2720, 2725, 186 L. Ed. 2d 794 (2013). The university and county Defendants received official pay for enforcing COVID mandates, which was outside the scope of their lawful and official duties (see pages 20-23 of the amended complaint). The right to make business decisions and to solicit business free from wrongful coercion is a protected property right under the Hobbs Act. 18 U.S.C.A. § 1951. U.S. v. Zemek United States Court of Appeals, Ninth Circuit. October 6, 1980 634 F.2d 1159.

The RICO 18 U.S.C. §1962(c) extortion claim would be best examined after discovery. It may be dismissed to the Defendants in their official capacities but not dismissed in their individual capacities.

As for the criminal statutes: "[E]ven if the statute at issue does not provide for a private right of action, plaintiffs′ claims should not automatically be dismissed. Under the liberal rules of federal practice, dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Corrections USA v. Dawe, 504 F. Supp. 2d 924, 934 (E.D. Cal. 2007).

The remaining claims should not be dismissed. They would be better assessed as the case develops.

Dated: 9/29/2023

I, Elijah Behringer, being duly sworn, do state and affirm according to law, that I have first-hand knowledge of the undisputed material facts and am competent to testify in these matters, and swear under penalty of perjury that these facts are true and correct.

Elijah J. Behringer

behringerlaw@pm.me
PO Box 2973
Crestline, CA 92325
(909) 222-5370

1

**PROOF OF SERVICE**

2

3      I, Elijah Behringer, declare and state:

4           I am over the age of 18 years old and a resident of San Bernardino County. My

5      mailing address is PO Box 2973, Crestline, CA 92325.

6           I have served a copy of this opposition brief by e-mail and electronic service to:

7

8      **Uri Niv**

9      Crowell Moring LLP
       515 South Flower Street 40th Floor

10     Los Angeles, CA 90071
       213-622-4750

11     Fax: 213-622-2690

12     Email: univ@crowell.com

13

14     **John R. Byerly**
       Smith Law Offices, LLP

15     4001 Eleventh Street

16     Riverside, California 92501
       Tel: (951) 509-1355

17     Fax: (951) 509-1356

18     jbyerly@smitlaw.com

19

20     I declare under penalty of perjury that the foregoing is true and correct.

21

22     Dated: 9/29/2023

23

24     _____

25     Elijah J. Behringer

26

27

28